# United States Court of Appeals

*for the*

# Third Circuit

Case No. 23-2260

UNITED STATES OF AMERICA,

– v. –

MATTHEW PUCCIO,

*Appellant.*

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY, IN NO. 2-21-CR-00157-001,
HONORABLE JOHN M. VAZQUEZ, U.S. DISTRICT JUDGE

## CORRECTED BRIEF AND APPENDIX FOR APPELLANT
## Volume 1 of 5 (Pages A1 to A18)

JAMES KOUSOUROS
LAW OFFICES OF JAMES KOUSOUROS
*Attorney for Appellant*
260 Madison Avenue, 22nd Floor
New York, New York 10016
(212) 532-1934

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................... ii

STATEMENT OF JURISDICTION ......................................................1

STATEMENT OF RELATED CASES AND PROCEEDINGS ............................1

STATEMENT OF ISSUES .................................................................1

STATEMENT OF THE CASE ..............................................................2

      The Trial ...............................................................................4

      The Defense Case ..................................................................14

      The Charge Conference ...........................................................16

      The Verdict, Presentence Report, Objections
      to the Presentence Report & Sentence .........................................17

SUMMARY OF ARGUMENT ............................................................18

ARGUMENT ................................................................................21

    I.     THE WILLFUL BLINDNESS INSTRUCTION WAS
            GIVEN IN ERROR AND THE INSTRUCTIONS TO THE
            JURY AS A WHOLE CONFUSED THE ISSUES OF
            KNOWLEDGE AND INTENT ...........................................21

            A.    Standard of Review ...............................................21

            B.    Argument ..........................................................21

    II.    THE THEE-LEVEL ROLE ENHANCEMENT PURSUANT
            TO U.S.S.G § 3B1.1(c) WAS NOT SUPPORTED BY THE
            EVIDENCE ...............................................................28

            A.    Standard of Review ...............................................28

            B.    Argument ..........................................................28

CONCLUSION ..............................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*E.E.O.C. v. Del. Dept. of Health and Soc. Servs.,*
  865 R.2d 1408 (3d Cir. 1989)................................................................21

*United States v. Basroon,*
  38 F. App'x 772 (3d Cir. 2002)..........................................................24

*United States v. Belletiere,*
  971 F.2d 961 (3d Cir. 1992)...............................................................29

*United States v. Caraballo-Rodriguez,*
  726 F.3d 418 (3d Cir. 2013)................................................................21

*United States v. DeGovanni,*
  104 F.3d 43 (3d Cir. 1997).......................................................... 29, 32

*United States v. Fuentes,*
  954 F.2d 151 (3d Cir. 1992)........................................................ 29, 30

*United States v. Hurley,*
  63 F.3d 1 (1st Cir. 1995)....................................................................24

*United States v. Khorozian,*
  333 F.3d 498 (3d Cir. 2003)...............................................................21

*United States v. Lizardo,*
  445 F.3d 73 (1st Cir. 2006)................................................................24

*United States v. Metro,*
  882 F.3d 431 (3d Cir. 2018)...............................................................28

*United States v.*
  *One 1973 Rolls Royce, V.I.N. SRH-16266 By & Through Goodman,*
  43 F.3d 794 (3d Cir. 1994)..................................................................21

*United States v. Parker,*
  462 F.3d 273 (3d Cir. 2006)...............................................................32

*United States v. Raia,*
  993 F.3d 185 (3d Cir. 2021)......................................................... 28-29

*United States v. Wert-Ruiz,*
  228 F.3d 250 (3d Cir. 2000)......................................................... 21-22

**Statutes & Other Authorities:**

18 U.S.C. § 24(b) ............................................................................2

18 U.S.C. § 1349 ............................................................................2

18 U.S.C. § 3231 ............................................................................1

28 U.S.C. § 1291 ............................................................................1

U.S.S.G. § 3B1.1 ...................................................................... 28, 29

U.S.S.G. § 3B1.1(b) .......................................................................1

U.S.S.G. § 3B1.1(c) ................................................................... 28, 29

U.S.S.G. § 3B1.2 ..........................................................................17

U.S.S.G. § 3C1.2 ..........................................................................17

U.S.S.G. § 4C1.1 ..........................................................................18

## STATEMENT OF JURISDICTION

This appeal is from a District Court's final judgment in a criminal case. (A. 5). [1] The District Court had jurisdiction under 18 U.S.C. § 3231. The District Court entered final judgment against Defendant-Appellant Matthew Puccio ("Mr. Puccio" or "Appellant") on June 29, 2023. Mr. Puccio filed a timely notice of appeal on July 11, 2023. (A. 17). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not previously been before this Court.

Counsel is aware of no other case or proceeding—completed, pending or about to be presented to this Court or any other court or agency, state or federal that is in any way related to this appeal.

## STATEMENT OF ISSUES

1.  Whether the District Court erred in charging the jury on willful blindness and whether the jury instructions as a whole were confusing and contradictory.

2.  Whether the three-level enhancement pursuant to U.S.S.G. § 3B1.1(b) for role in the offense was warranted.

---

[1] The Joint Appendix will be cited to herein after as "A. ".

## STATEMENT OF THE CASE

In February 2021, Appellant was indicted in the District of New Jersey and charged under 18 U.S.C. § 1349 with a conspiracy to defraud a health care program, as defined by 18 U.S.C. § 24(b). The conspiracy was alleged to have been committed from in or around November 2014 and continuing through at least in and around March 2016.

The Government alleged that Appellant acted as a sales representative for a marketing company, Rep Network, and with his brother-in-law, Peter Frazzano marketed compound creams mainly to educators whose insurance covered the cost of the creams. Appellant received a commission for every prescription filled either through his marketing efforts or from the efforts of others he had recruited as a sales representative.

The conspiracy was headed by the president of Rep Network, Jennifer Figueroa. Directly under Ms. Figueroa was her office administrator who managed the day-to-day affairs of the company. Rep Network employed marketers who sought relationships with doctors willing to write prescriptions for compound creams. The creams were not FDA approved but were often prescribed in various iterations to patients for whom traditional medications were not effective. The Government alleged that the doctors were given pre-filled prescriptions to sign without examining the patients to determine the medical necessity of the products.

Prior to Appellant's involvement with Rep Network, the company recruited Dr. Robert Agresti to sign fraudulent prescriptions for $300 per prescription. Christopher Blackstone owned Prime Pharmacy Solutions and he was responsible for not only filling prescriptions but altering the prescriptions used by all the sales reps to comport with insurance coverage as ingredients were often excluded from coverage. Rep Network employed recruiters Chris Cuffari and others who onboarded other sales reps to market the creams. Appellant was recruited by Cuffari while at his place of employment as a mortgage broker. Cuffari did not testify at trial; however, it was clear that the initial conversations with Appellant did not involve any illegality. Appellant was hired as a marketer of the compound creams. There was no evidence that Appellant was involved in or aware of the conspiracy at the time of his initial employment.

It was alleged that after Appellant joined Rep Network, he recruited his brother-in-law, Peter Frazzano, to join the conspiracy and that together they recruited one physician, Dr. Gregg Marella, to submit medically unnecessary prescriptions without examining patients. Frazzano pled guilty and entered into a cooperation agreement with the Government as did others who participated in the fraud.

The trial commenced on July 11, 2022. The defense maintained that the fraud was committed by Frazzano and that Appellant was not aware that Frazzano recruited the doctor and patients to receive the compound creams without proper

medical evaluation. The evidence at trial did establish that while Appellant met with Dr. Marella, along with Frazzano, it was Frazzano who had access to and recruited educators from his school whose insurance was known to cover the compound creams. Appellant testified in his own defense.

On July 19, 2022, prior to summations, defense counsel objected to the inclusion of a willful blindness jury instruction. The Court granted the Government's request to include a willful blindness charge. Appellant was convicted of the sole count in the Indictment and, on June 29, 2023, Appellant was sentenced to 60-months imprisonment. Appellant surrendered on October 28, 2023, and is currently serving his sentence.

**The Trial**

The Government's first witness was Peter Frazzano, Appellant's brother-in law. Frazzano entered a plea pursuant to a cooperation agreement with the Government. (A. 523). He was facing a maximum sentence of ten years and agreed to cooperate and testify against Appellant.

At the time of the alleged fraud, Frazzano was an educator and later a principal at the Sussex Avenue School in Morristown. (A. 462). Frazzano testified that Appellant approached him and told him that he had been working with a pharmaceutical company and asked him whether he was interested in obtaining compound creams for scars and for weight loss. (A. 464). Frazzano gave Appellant

his insurance card and did receive the compound creams. Frazzano continued receiving the creams for five-months notwithstanding the fact that he did not have conditions which warranted them. (A. 467). Frazzano testified that Appellant paid any required co-payments. (A. 470).

Frazzano testified that Appellant suggested that he too join him as a sales representative given his employment as a principal and his access to educators whose insurance covered the compound creams. (A. 472). Frazzano accepted as he was in substantial debt and welcomed the opportunity to earn additional income. He was sent onboarding paperwork from Rep Network and became a sales rep. He then set out to find a doctor comfortable with prescribing compound creams. (A. 474).

Frazzano recruited Dr. Gregg Marella to prescribe compound creams. Dr. Marella was a physician that had been married to a school nurse Frazzano knew. (A. 488). Frazzano met with Dr. Marella alone and inquired as to whether Dr. Marella would be willing to prescribe the creams. Dr. Marella agreed. A meeting was scheduled and attended by Appellant and Frazzano during which Dr. Marella was recruited and agreed to write prescriptions for the creams for his patients. (A. 490).

After not receiving any prescriptions from Dr. Marella, Frazzano approached teachers at his school who did have insurance that would cover the compound creams. Frazzano testified that he and Appellant brought the prescriptions to Dr. Marella for his signature and instructed him to fax them to the pharmacies. (A. 490-

492). This included Frazzano's wife and mother-in-law. Frazzano testified that it was Appellant that arranged for his mother-in-law's prescriptions. (A. 492-493). To his knowledge, Frazzano did not believe the patients he referred had seen Dr. Marella. (A. 496).

He further testified that on one occasion he and Appellant gave Dr. Marella $500 as "motivation" for writing the prescriptions. (A. 497-498). The manner of payment was disputed later through the testimony of Dr. Marella. Frazzano estimated that they met with Dr. Marella five to seven times. (A. 498). Frazzano testified that Appellant had advised him to push scar and pain creams as they were the highest adjudicating compound creams. Frazzano paid any applicable co-payments to the patients who received the compound creams.

While Frazzano included Appellant in his endeavors it was clear that Frazzano recruited Dr. Marella and the patients from his school. Frazzano was paid directly from pharmacies and in some instances his portion of commissions were paid by Appellant as he and Frazzano split the commissions, each receiving an equal share. (A. 475-476). Over the course of the alleged conspiracy, Mr. Puccio and Frazzano each received in excess of $200,000 in commissions. Frazzano was ultimately held responsible for a loss of $2,727,292. Appellant was held responsible for a loss of $2,600,000.

In September 2017, Frazzano was approached by the FBI concerning this investigation. Frazzano was not truthful during this interview. (A. 517-518). Frazzano's wife immediately called Appellant who arrived at his home shortly thereafter. Appellant called Jennifer Figueroa, the owner of Rep Network and informed her that the FBI had visited Frazzano. (A. 519-520). Frazzano testified that he was instructed by Appellant to call patients and tell them what to say if questioned by the FBI. Frazzano further testified that Appellant deleted materials from his phone relating to the compound creams. (A. 521).

On cross examination Frazzano admitted that he was in significant debt while he was engaged in the charged conduct. (A. 528, 537-538, 540). While Frazzano testified that Appellant covered his co-pays, these payments were not reflected in his bank records. (A. 535). Frazzano otherwise confirmed that it was he who initially recruited Dr. Marella and then recruited fellow educators to obtain the compound creams.

Dr. Robert Agresti was a plastic surgeon for 25 years until 2019. He had prescribed compound creams since 2015. (A. 546). He began writing prescriptions for compound creams without seeing patients in return for $300 for each prescription. Dr. Agresti pled guilty to a conspiracy to commit health care fraud and agreed to cooperate with the Government. (A. 547-548). Dr. Agresti wrote the prescription for Frazzano without performing an examination. (A. 554). For patients

he did not examine, he received their insurance cards from the sales representatives working for Rep Network. (A. 562). Dr. Agresti also wrote the prescription for Appellant's wife, Carolina Galindo. He did not examine Ms. Galindo. (A. 602).

On cross examination, Dr. Agresti testified that he was introduced to Chris Cuffari and began working with Cuffari on the compound creams. (A. 608). He received $300 from Cuffari for each prescription which was adjudicated. The only representatives he worked with were Steve Salerno, Ray Salerno, and Chris Cuffari. (A. 609). Dr. Agresti had never met or communicated with Appellant. The Government introduced several prescriptions through Dr. Agresti who explained that they were filled out by the reps.

Dr. Gregg Marella was a licensed physician who was initially approached by Frazzano and asked whether he would be open to prescribing compound creams for his patients. He testified that he later met with Appellant and Frazzano who presented him with pre-printed prescriptions for him to sign. (A. 624). This occurred at dinner meetings and in his office. In total the three met approximately six times. On one occasion Dr. Marella testified that he was given $500 along with the prescriptions. He contacted Frazzano and told him that this payment was not necessary. He further testified that the payment was in five one-hundred-dollar bills.[2] Once Dr. Marella

---

[2] This was contradicted by Frazzano's testimony in which he stated that both he and Appellant contributed to this payment, each providing $250.

was presented with the prescriptions he agreed to sign them to make it easier for them. (A. 626). Dr. Marella would then fax the prescriptions to a pharmacy. (A. 627). Dr. Marella then identified prescriptions that he was presented with and signed. He did not examine these patients. (A. 628-659). Despite his admission to signing these prescriptions without examining patients, Dr. Marella was not prosecuted. There was no evidence that Marella discussed any illegal conduct in Appellant's presence when he met with Appellant and Frazzano.

Christopher Blackstone was a physical therapist in Louisiana and the owner of Prime Pharmacy Solutions pharmacy, a compounding pharmacy. (A. 678-679). The pharmacy would receive prescriptions for the compounding creams and then combine several ingredients to fill the prescriptions. (A. 680). Once the prescriptions were filled, the pharmacy would bill insurance companies and split the profit with the marketing representatives that brought the prescription to the pharmacy. (A. 681-682). Blackstone was contacted by Figueroa, the president of Rep Network who offered the company's services. (A. 862). He recognized Appellant's name as a representative working for Rep Network.

Blackstone created customized prescription templates for the compounding creams which listed all the formulas that were covered by insurance companies for the reps to use. (A. 683-684). The templates were constantly changing depending on the formulas that would be covered. This was a constantly moving target as

ingredients were often removed from those that would be covered by insurance companies. His expertise in formulating the prescription pads was indispensable to the conspiracy and it was Blackstone's product that was distributed to the sales reps. Blackstone had a portal created so that the reps could see in real time when the prescriptions they had generated had been approved and filled as this triggered payment to the rep. Blackstone testified that a separate portal was created for Appellant. (A. 695).

Blackstone and Figueroa conspired to have the higher paying compound creams prescribed and refilled and Blackstone accordingly listed them on the prescription pads in that order. As a result of his conduct, Blackstone pled guilty to conspiracy to commit health care fraud in the Eastern District of Louisiana pursuant to a cooperation agreement. (A. 690-691). It was clear that Blackstone and Agresti occupied managerial roles in the conspiracy along with Figueroa and her staff.

Blake Allen Stockwell was an employee of Express Scripts which had merged with Medco, a pharmacy benefits manager that worked with pharmacies managing their prescriptions. Stockwell was an investigator responsible for investigating pharmacies for possible fraud. (A. 758-760). Once a prescription was issued, it would be sent to Express Scripts which would check for active coverage and for whether the medications prescribed were covered by an in-network pharmacy. (A. 761). Once approved, the pharmacy would be notified that the prescription could be

filled. For compound creams or medications, they would have to check that each separate ingredient was covered. (A. 764). Stockwell testified that pursuant to the terms of their contract with participating pharmacies, claims would not be approved if patients had not been examined by doctors. Additionally, claims generated by marketers were not permitted. (A. 766). Stockwell was asked to compile data for Dr. Marella and Dr. Agresti and reviewed funds paid by insurers for patients for whom compound medications were prescribed by them. There was no testimony that the prohibitions detailed above were communicated to Appellant at the time he was enlisted as a sales rep. Appellant had never worked in the pharmaceutical industry prior to his employment with Rep Network.

Anthony Lewis-Lahey was a teacher at the same school Frazzano was principal. Frazzano approached Lewis-Lahey and suggested that he use compound creams. Lahey agreed and he soon thereafter received the creams in the mail. The prescription was written by Dr. Marella. Lahey was not a patient of Dr. Marella. (A. 850). Frazzano paid the $40 co-pay required for the compound creams. (A. 850-851).

At some point in 2017, Frazzano called Lewis-Lahey and told him that he might receive a call from someone like an insurance agent about the medications. (A. 852). Frazzano instructed him to lie. Frazzano did this several times and

eventually Lewis-Lahey recorded the conversation. (A. 854). There was never any contact between Appellant and Lewis-Lahey.

Raymond Harris was another employee of the school that Frazzano worked at (A. 862). Frazzano told Harris that he was involved in a business with Appellant. Harris met with Frazzano and Appellant and they asked him if he was interested in becoming a rep for the compound creams. (A. 863-864). Harris consulted his physician and an email was admitted in which the physician related that topical creams were very expensive and were the source of potential fraud allegations. (A. 865-869). He did not join the company. Harris did not relate any discussions between himself and Appellant or Frazzano when they offered him the position to suggest that they conveyed any illegal conduct.

Notwithstanding his trepidation concerning becoming a sales rep, Harris did receive creams. He had not seen a doctor prior to the prescription being filled however he did provide his insurance card to Frazzano. (A. 870). Frazzano gave Harris a check for $150 to cover his co-pay. (A. 874-876). Frazzano also approached Harris and told him that if he was spoken to by the FBI he should lie about how he received the compound creams. (A. 884-885). Appellant was not present for this conversation. Harris never received any money from Appellant. (A. 885-886).

Cristina Frazzano was Frazzano's wife. (A. 930). Ms. Frazzano received compound creams prescribed by both Drs. Agresti and Marella. She had never been

examined by either physician nor did she suffer from the ailments indicated on the documents used to secure the prescriptions. (A. 932-936). These prescriptions were precipitated by Mr. Frazzano. Ms. Frazzano testified that in September 2017, the FBI went to her home and questioned her husband about his involvement with the compound creams. Ms. Frazzano called the Puccios. (A. 938). Mr. and Ms. Puccio arrived at the home shortly thereafter and Appellant called Figueroa. Appellant related that Figueroa instructed them to call individuals who had received the creams and tell them to relate to any questioner that they did see a doctor, that they used the creams and that they personally paid for their co-pays. Mr. Frazzano made the calls as directed. (A. 939)

Linda Ruta was the Government's last witness. She too received compound creams at the suggestion of Mr. Frazzano. (A. 995-996). Her prescription was issued by Dr. Marella, her ex-husband. Ms. Ruta had never met Appellant and she had no interactions with him concerning the compound creams.

Essentially, the evidence established that it was Frazzano who recruited Marella initially and it was Frazzano who recruited the patients for whom both he and Appellant were compensated. Appellant admitted his involvement with the company but denied that he was aware of the fraud.

**The Defense Case**

Michael Varland was called as a character witness. He got a visit from the FBI that he described as aggressive and traumatizing. He testified as to Appellant's good character over the twenty years he had known him. (A. 1010-1015).

Carolina Puccio, Appellant's wife and mother of their two young children testified for the defense. Ms. Puccio submitted a prescription for compound creams but her insurance denied coverage. On cross examination Ms. Puccio was presented with the prescription in her maiden name issued by Dr. Agresti whom she did not know. (A. 1018-1026).

Martha Galindo, Appellant's mother-in-law received compound creams that were prescribed by Dr. Marella whom she had seen for certain ailments in the past. She was questioned in detail about the volume of creams she received and the cost of the creams. Ms. Galindo testified at length concerning checks she had received from the Puccios and explained that these checks were repayments for wedding expenditures and for gifts her children often gave to her. This testimony countered the Government's claims that Appellant had paid for Ms. Galindo's co-pays for the compound creams. (A. 1034-1054).

Appellant testified in his defense. Prior to becoming employed by Rep Network he was employed as a mortgage broker for fifteen years. (A. 1071). Appellant was introduced to Rep Network by Chris Cuffari who was meeting with

others at his mortgage company and discussing compound creams. Appellant was interested and asked for some marketing materials which he forwarded to his brother-in-law Mr. Frazzano. (A. 1072-1074). He later introduced Frazzano to Cuffari (A. 1080-1081). Both he and Frazzano applied to be sales reps for Rep Network. Appellant signed on with several different pharmacies. He would receive prescription pads from Rep Network. (A. 1091-1092). Appellant denied ever filling out patient's information on the prescription sheets he was provided with. (A. 1093). He testified that the information had to be filled out by the doctor who would then fax the prescription to the pharmacy. (A. 1093-1094).

Appellant testified that it was the rep's obligation to sign up a doctor to consider the compound creams. He did not have a doctor, but Frazzano, who had been involved in the health care business with another product, Isogenix, said he did have a doctor that he could ask to prescribe the compound creams. This was Dr. Marella. He and Frazzano set out to market the products at events in which they would bring a doctor, set up a booth and have the doctors speak with potential patients for the creams. (A. 1099).

Appellant denied complicity in the conspiracy. He testified that as far as he knew, prospective patients had to see a doctor prior to receiving the compound creams. Counsel elicited instances in which Appellant attempted to facilitate doctor visits for patients unable to physically meet with doctors through telemedicine

consults. (A. 1106-1109). Appellant testified that once he realized that Rep Network was not conducting its business properly, he cut ties with the company.

On cross-examination Appellant testified that his commissions were based upon sales made by other sales reps he brought in to work at Rep Network. (A. 1112). With respect to Dr. Marella, Appellant testified that it was Frazzano who brought Dr. Marella to him. He conceded that they took Dr. Marella to dinner and discussed having him prescribe compound creams to patients. Appellant testified that they gave Dr. Marella blank prescriptions to use for patients he would be prescribing the compound creams for. (A. 1114).

With respect to the events of September 17, 2017, Appellant testified that he received a call from Ms. Frazzano and texted Figueroa to call him. (A. 1120-1121). Appellant denied telling Frazzano to instruct others to lie and there was no evidence of any calls from Appellant to individuals who received the compound creams. With regard to the number of prescriptions filled for particular patients, Appellant explained that it appeared that some prescriptions were filled by two separate pharmacies and that he alerted Rep Network to this issue. (A. 1149). After Appellant's testimony, the defense rested.

**The Charge Conference**

A charge conference was conducted prior to summations during which the defense objected to an instruction on willful blindness. (A. 1189-1192,1240-1247).

While the District Court acknowledged that willful blindness cannot be applied to the agreement component of a conspiracy or intent, the District Court ultimately ruled that willful blindness was appropriate on the issue of knowledge of the underlying health care fraud.

## The Verdict, Presentence Report, Objections to the Presentence Report & Sentence

Appellant was found guilty of the sole charge in the Indictment. On June 29, 2023, Appellant was sentenced to 60-months imprisonment. In advance of sentencing, the defense filed objections to the role adjustment pursuant to U.S.S.G. § 3B1.2 of the guidelines, the obstruction enhancement pursuant to U.S.S.G. § 3C1.2 and the initial base offense level of 7. (A. 1485-1490.)

With respect to the role adjustment, defense counsel argued that from a high level, Appellant was not a leader in this offense but rather a lower-level participant. The trial testimony clearly showed that Figueroa was the president of Rep Network and the overall leader. Her assistant orchestrated and managed the affairs of the conspiracy. Blackstone created the prescription pads and was responsible for re-constructing them when ingredients were no longer covered. The doctors were the gatekeepers responsible for writing the prescriptions for the many sales reps who submitted them. The pharmacies were then front and center in their filling of the prescriptions. Cuffari was clearly a top recruiter who brought Appellant into the fold. While Appellant introduced Frazzano to this conspiracy, it was not initially offered

as a fraudulent scheme. Indeed, there was no testimony that Cuffari brought Appellant into this position with a fraudulent goal. He was brought on to market what he undisputedly believed to a worthwhile product. As for the division of profits, both Appellant and Frazzano shared equally in the commissions. From a monetary standpoint, Appellant was not above Frazzano and the evidence clearly demonstrated that Appellant only recruited a small minority of the patients. The defense view was that a managerial role, especially the three levels assigned, was not supported by the evidence.

The parties agreed that the appropriate base offense level was 6, the District Court reduced the role enhancement by one-level and applied the obstruction enhancement. This resulted in an adjusted offense level of 28 and a guideline range of 78-97 months. The Government proffered that a sentence of 60-72 months was appropriate and the Court sentenced Appellant to 60-months imprisonment.[3]

Appellant voluntarily surrendered on October 28, 2023, and is currently serving his sentence.

## SUMMARY OF ARGUMENT

1.     The District Court erred in instructing the jury on willful blindness, in two respects. First, while willful blindness may be used to establish the knowledge

---

[3] As the recently enacted amendment to the Guidelines (*see* U.S.S.G. § 4C1.1) had not been formally enacted, this reduction was not addressed.

element of a conspiracy, it cannot be used to infer that the defendant intended to enter an unlawful agreement. Indeed, recognizing the risk that a jury will confuse the two elements, other circuits have required district courts to clearly instruct the jury about the inferential limits of willful blindness. The District Court did not do that below. Its instructions, which were prolix and convoluted, provided no such guidance.

Second, a willful blindness charge may only be read where there the evidence supports a finding that the defendant deliberately avoided learning the criminal conduct. However, there was no such evidence here. To the contrary, the Government's theory of the case was that Appellant exercised a managerial role—a theory that is mutually exclusive with deliberate avoidance. The District Court prejudiced Appellant by allowing the jury to consider two, irreconcilable theories of criminal liability.

2.     The District Court erred in imposing a two-point managerial role enhancement. As this Court has squarely held, the managerial role enhancement provision of the Guidelines is to be narrowly construed and applied only to those participants whose culpability and level of involvement *exceeds* that of their co-conspirators. It is not enough that the defendant occasionally offers direction to a co-conspirator.

Here, there was no evidence supporting such a finding. The evidence at trial showed that the architect of the scheme was Figueroa; that Blackstone was responsible for creating customized prescription pads; that Dr. Agresti was responsible for writing the prescriptions; that Cuffari, Salerno, and their associates served as the main recruiters, and that Frazzano enlisted Dr. Marella. Appellant, according to the Government's own witness, was essentially a "sales guy and the closer." The impropriety of the enhancement is further confirmed by the fact that Appellant's loss amount was less than his co-conspirators, and the duration of his participation in the conspiracy was less than all but one of the co-conspirators. Finally, the fact that none of the ring leaders were given a role enhancement creates a sentencing disparity that cannot be justified by any facts in the record.

Because there is no evidence that Appellant occupied a higher place in the hierarchy than any other member of the conspiracy, and because even the architects of the conspiracy were not given an enhancement, the application of the role enhancement to Appellant was clear error.

# **ARGUMENT**

## I. THE WILLFUL BLINDNESS INSTRUCTION WAS GIVEN IN ERROR AND THE INSTRUCTIONS TO THE JURY AS A WHOLE CONFUSED THE ISSUES OF KNOWLEDGE AND INTENT

### A. Standard of Review

In determining whether jury instructions stated the proper legal standard, this Court reviews the instructions for an abuse of discretion. *United States v. Khorozian*, 333 F.3d 498, 507-08 (3rd Cir. 2003). Jury instructions are considered as a whole in determining the propriety thereof and the effect any error may have had in deliberations. *E.E.O.C. v. Del. Dept. of Health and Soc. Servs.*, 865 R.2d 1408, 1418 (3rd Cir. 1989).

### B. Argument

The willful blindness instruction was given in error in this case. Because willful blindness is "a subset of knowledge" and "an alternative way of proving knowledge," evidence of "willful blindness [may be] sufficient to prove knowledge." *United States v. One 1973 Rolls Royce, V.I.N. SRH-16266 By & Through Goodman*, 43 F.3d 794, 813 (3d Cir. 1994); *see also United States v. Caraballo-Rodriguez*, 726 F.3d 418, 420 n.2 (3d Cir. 2013). However, a "willful blindness" instruction "must make clear that the defendant *himself* was subjectively aware of the high probability of the fact in question, and not merely that a reasonable man would have been aware of the probability." *United States v. Wert-Ruiz*, 228 F.3d

250, 255 (3d Cir. 2000) (emphasis added). Only where the evidence supports a finding that the defendant "deliberately avoided learning" about the criminal scheme may a willful blindness instruction be given. *Id.* at 252, 258.[4]

Here, the Government's own evidence foreclosed a finding that Appellant deliberately avoided learning about the criminal scheme. The Government's theory, from the outset, was that Appellant was aware of the health care fraud, joined the conspiracy, and actively participated therein. Indeed, the Government argued that Appellant was a manager of the activity which formed the basis of the fraud. These two theories cannot logically co-exist. It is one thing to avoid learning of a crime by turning a blind eye; however, it is both logically impossible to manage a conspiracy while purposefully maintaining ignorance of that same conspiracy. While Appellant acknowledges that willful blindness can, in some circumstances, be charged in a case in which actual knowledge is also considered, in this case, the Government should have been held to its theory of prosecution and not permitted to argue a mutually exclusive alternative.

---

[4] During the charge conference, counsel argued that the facts did not warrant a willful blindness instruction. At the outset of the discussion, the District Court noted that given the absence of a substantive count in the Indictment, a willful blindness charge would not be appropriate in these circumstances. Only after the District Court was presented with cases in which the charge was endorsed, did the District Court agree to charge the jury that willful blindness could be considered on the issue of knowledge.

While Appellant denied culpability in the scheme, as would any defendant who proceeds to trial, he candidly admitted the underlying facts posited by the Government. Appellant admitted being a rep for Rep Network, introducing Frazzano to the company, meeting with Dr. Marella to prescribe compound creams to his patients and splitting commissions with Frazzano. Contrary to Dr. Agresti, who entered this conspiracy for payment for each prescription he wrote, Dr. Marella entered into no such agreement. He testified that he agreed to write prescriptions as a favor to Frazzano and it was Frazzano who arranged for the patients Dr. Marella dealt with.

Appellant testified that as far as he knew, patients had to be examined prior to having prescriptions issued. To further support his defense, Appellant introduced his own emails in which he asked Figueroa how to have patients who could not physically meet with doctors arrange to meet them virtually. These uncontroverted communications, which show that Appellant took steps to avoid the very conduct for which he was accused, directly undercut the Government's theory that he was subjectively aware that a fraud was being committed. This was not a situation in which an accused just sat back and turned a blind eye to the criminality occurring under his nose.

Alternatively, even if the instruction was warranted, the instruction given did not sufficiently convey to the jury that willful blindness could not be considered on

the issue of whether Appellant agreed with others to commit the underlying health care fraud. It is well established that, while willful blindness may be used to establish knowledge, it cannot be used to establish intent to enter into an unlawful agreement. *United States v. Basroon*, 38 F. App'x 772, 781 (3d Cir. 2002); *United States v. Hurley*, 63 F.3d 1, 9-10 (1st Cir. 1995). Here, the charge was contradictory on the issue of knowledge, and did not properly convey to the jury that willful blindness could not be considered in the issue of whether Appellant knowingly and willfully joined the conspiracy. *See United States v. Lizardo*, 445 F.3d 73, 86 (1st Cir. 2006) (finding error in jury instructions that "were not clear that willful blindness applied only to the [knowledge] element of the conspiracy charge," and which did not clearly inform the jury that "[t]he third element requires an intent to join the conspiracy, and that is not established by willful blindness.").

With regard to the commission of health care fraud, the District Court charged the jury that this "require[d] that the Government prove that the defendant acted knowingly with respect to certain elements. This means that the Government must prove beyond a reasonable doubt that the defendant was conscious and aware of the nature of his actions and of the surrounding facts and circumstances." (A. 1274). The District Court then instructed the jury that the "Government is not required to prove that the defendant knew his acts were against the law." (A. 1274).

With respect to acting willfully, the District Court charged the jury that "the Government must prove beyond a reasonable doubt that the defendant knew that his conduct was unlawful and intended to do something that the law forbids," and that "defendant acted with the purpose to disobey or disregard the law." (A. 1275).

With regard to the only charge in the Indictment—a conspiracy to commit health care fraud—the District Court advised the jury that the "Government must prove that the defendant knew the goal or objective of the agreement or conspiracy and voluntarily joined it during its existence, intending to achieve the common goal or objective, and to work together with the other alleged conspirators toward that goal or objective." (A. 1281). These instructions directly contradicted the charge with regard to the commission of health care fraud and raised the possibility that the jury convicted Appellant even if he was not, as he claimed, aware of the illegal conduct Frazzano had been committing.

The Court charged the jury on willful blindness thusly:

Even though it has the same word as willfully, which I defined, willful blindness is different. It's a substitute for knowledge, which I already defined. I just want to make sure we keep those distinct.

To find the defendant guilty of conspiracy to commit health care fraud, you must find that the Government proved beyond a reasonable doubt that the defendant knew the object of the conspiracy was to commit health care fraud by facilitating the prescribing of medically unnecessary prescriptions in order to generate a profit.

In this case, there's a question whether the defendant knew that any other person committed any element of health care fraud. When, as in

this case, knowledge of a particular fact or circumstance is an essential part of the offense charged, the Government may prove that the defendant knew of that fact or circumstance, if the evidence proves beyond a reasonable doubt that the defendant deliberately closed his eyes to what would otherwise have been obvious to him.

No one can avoid responsibility for a crime by deliberately ignoring what is obvious. Thus, you may find that the defendant knew that any other person committed an element of health care fraud based on evidence which proves that the defendant himself subjectively believed that there was a high probability that this fact existed, and defendant consciously took deliberate actions to avoid learning about the existence of this fact.

You may not find that the defendant knew that any other person committed any element of health care fraud if you find that the defendant actually believed that this fact did not exist. Also, you may not find that the defendant knew that any other person committed any element of health care fraud if you find only that the defendant consciously disregarded a risk that the fact existed, or that the defendant should have known that the circumstances existed, or that a reasonable person would have known of a high probability that the circumstance exists.

It is not enough that the defendant may have been reckless or stupid or foolish, or may have acted out of inadvertence or accident. You must find that the defendant himself subjectively believed there was a high probability of the existence that any other person committed any element of health care fraud, consciously took deliberate actions to avoid learning about it, and did not actually believe that it did not exist.

(A. 1276-1278).

At no time did the District Court advise the jury of the distinct issues of entering into an agreement and knowledge that health care fraud was being committed. Clearly one cannot be willfully blind to whether he or she was entering into an agreement. Willful blindness could only be applied on the issue of whether

Appellant knew that the agreement he was entering into was to commit an illegal act, a fact disavowed in the instruction relating to the commission of health care fraud.

This is an issue of significance in the instant case. There was no dispute that when Appellant became a sales rep for Rep Network, his "agreement" was to market compound creams he had been told about. There was no evidence that when Cuffari approached and signed Appellant on that they had discussed any criminal conduct. Appellant was given materials to educate himself on compound creams and he set out to market them. When this was unsuccessful, he introduced Frazzano to the position, and it was Frazzano who then brought Dr. Marella on board as a doctor and then his fellow educators to receive the compound creams. There was no evidence that Appellant agreed to join any conspiracy when he spoke with Cuffari or Frazzano initially. The law required that the jury be instructed in a manner which separated the agreement and Appellant's alleged knowledge of the object of the conspiracy which at best, if believed, occurred later. Instead, the jury was instructed, essentially, that irrespective of whether Appellant knew his acts were illegal, he could be held criminally liable. We respectfully submit that the charge as a whole was confusing and contradictory and that the inclusion of willful blindness in this case, in which the sole charge was a conspiracy, was given in error.

## II. THE THEE-LEVEL ROLE ENHANCEMENT PURSUANT TO U.S.S.G § 3B1.1(c) WAS NOT SUPPORTED BY THE EVIDENCE

A. Standard of Review

This Court reviews the District Court's "interpretation of the Sentencing Guidelines *de novo*, its findings of fact for clear error, and its application of the Guidelines to facts for abuse of discretion." *United States v. Metro*, 882 F.3d 431, 437 (3d Cir. 2018) (cleaned up).

B. Argument

The Court imposition of a two-level managerial enhancement pursuant to Section 3B1.1(c) was plain error. Section 3B1.1 provides for enhancements for a defendant who played an aggravating role in the offense:

> (a)    If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

> (b)    If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

> (c)    If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

U.S.S.G. § 3B1.1.

"For the aggravating role enhancement to apply, the evidence must show [by a preponderance of the evidence] that the defendant exercised some degree of control over at least one other person involved in the offense." *United States v. Raia*, 993

F.3d 185, 192 (3d Cir. 2021); *see also United States v. DeGovanni*, 104 F.3d 43, 44 (3d Cir. 1997) ("[O]ne is only a 'supervisor' under U.S.S.G. § 3B1.1(c) when he is so involved in, and connected to, the illegal activity of others that he actually supervises their illegal conduct."); *United States v. Belletiere*, 971 F.2d 961, 969 (3d Cir. 1992) ("[S]ection 3B1.1 applies to situations where an individual is a leader or organizer of individuals who participate together in committing one or more criminal acts."). As explained by the Third Circuit in *United States v. Fuentes*:

> [T]he adjustments authorized [by §§ 3B1.1 …] for role in the offense are directed to the relative culpability of participants in group conduct. When the terms "manage" and "supervise" in § 3B1.1 are limited to the management or supervision of other persons, they serve well the purpose of assigning relative fault among criminal co-adventurers. When a person manages or supervises another in the course of a criminal enterprise, the manager or supervisor will normally be more culpable than the person managed or supervised. On the other hand, when those terms are read to apply as well to tangible or intangible things, their utility in assessing relative fault is greatly diminished, if not destroyed. The lowliest participant in a criminal enterprise can ordinarily be said to manage, in the broad sense of that word, some segment or property of the enterprise. Thus one can describe the street corner peddler of drugs as managing the drug ring's "Fourth and Market operation," or the ring's packager as managing its packaging operation. For this reason, we hold that § 3B1.1 should be given the narrower reading and that a defendant's offense level may not be increased under that section in the absence of evidence that he or she managed or supervised someone else.

954 F.2d 151, 153-54 (3d Cir. 1992).

At the outset, the trial evidence clearly showed that Appellant was not the architect of the scheme. The scheme was devised, orchestrated and facilitated by

Figueroa, the president of Rep Network. Nor did it show that "anyone worked for or under the direction of" Appellant sufficient to justify the enhancement. *See Fuentes*, 954 F.2d at 153. The Government made much of emails in which someone indicated that Appellant was a "manager." This was simply belied by the facts adduced at the trial.

Appellant was introduced to Rep Network when he was the branch manager for a large mortgage bank, Intercontinental Capital Group. (A. 1072). He was working a legitimate job supporting his family when this introduction was made. He was not aware of any illegality at that time. He viewed this as a career opportunity and understood his position to be that of a salesperson. The testimony of Frazzano (whose testimony was critical to Appellant's conviction) was that Appellant "was the sales guy and the closer." (A. 514). While the Government points to Frazzano's recruitment by Appellant, it is significant to note that this was before Appellant was shown to have been aware that there was a criminal conspiracy afoot. When Appellant was recruited by Cuffari, it was posited as a legitimate sales job. Appellant approached Frazzano to join as he was unable to secure patients and Frazzano had a doctor he could approach to prescribe the compound creams. Thus, the recruitment was not of a criminal co-conspirator at the time it occurred.

From a hierarchal perspective, Figueroa was the leader of this scheme as she was the principal of the company. Her assistant was immediately under her and

managed every aspect of the scheme. Blackstone was next in line as he created customized prescription pads and was responsible for amending them as ingredients were no longer approved. Blackstone and Figueroa worked closely to include the highest paying compounds in the prescriptions. Dr. Agresti was clearly an elevated participant as he signed on to issue prescriptions for $300 each. He signed prescriptions from most, if not all, of the sales reps. Cuffari, Salerno and their associates were main recruiters for Figueroa. Cuffari recruited Appellant who brought Frazzano into the fold and Frazzano enlisted Dr. Marella. Frazzano met with Dr. Marella alone and only later brought him to Appellant. Frazzano recruited three teachers from his school who received compound medications. They were referred to by Probation as his "the teacher recruits" and it was Frazzano who reimbursed the teachers for their co-payments on the medications they received. (PSR ¶40). The fact that Appellant split his commissions with Frazzano did not elevate him. Indeed, this demonstrates that Appellant was not in a higher position than Frazzano. They were both sales reps doing the same thing and collecting commissions from each other's business and splitting them in equal increments. Appellant served in a non-managerial capacity.

The inapplicability of a manager/supervisor enhancement is further illustrated by the PSR's loss amounts attributable to each defendant and the relative duration of Appellant's involvement in the compounding fraud scheme. Appellant was

responsible for a loss amount of $2.65 million, which is less than the loss amounts attributable to each of his three codefendants and certainly that of Ms. Figueroa. *See DeGovanni*, 104 F.3d at 44-46 (finding "clear error" in the district court's application of the supervisor enhancement, where the defendant's "activities mirrored those of the other low-level participants" and whose "role was clearly distinguishable from primary players in the conspiracy"). Appellant was not involved in this conduct for as long as others. Appellant was charged with participation from November 2014 through in or around March 2016. Dr. Agresti participated in the scheme from November 2014 through September 2017 and was responsible for losses of $2,650.000. Figueroa was clearly involved for longer than all other participants.

Moreover, as noted in the defense sentencing submission, despite the greater involvement of the other conspirators, none apart from Appellant were assigned aggravating roles. This disparity has no basis in the factual record. *Cf. United States v. Parker*, 462 F.3d 273, 278 (3d Cir. 2006) ("similar offenders engaged in similar conduct should be sentenced equivalently" and "disparate sentences are [only] allowed where the disparity is explicable by the facts on the record.").

Dr. Agresti was involved for the longest period of time and was not assigned a role enhancement in his plea agreement. (A. 1497-1056). Frazzano joined the conspiracy prior to Appellant, committed the same conduct if not more than Appellant and was responsible for a loss of $2,727,292. He too was not assigned a

role enhancement in his plea agreement. (A. 1507-1516). Even more glaring was Figueroa's agreed upon guidelines range as set forth in the plea agreement. Figueroa was the principal of the company, recruited sales representatives, and managed their accounts. Yet, despite being the most culpable person in the scheme, Figueroa was not assigned a role enhancement in her plea agreement. (A. 1517-1527).

The fact that the other co-conspirators pled guilty and cooperated does not alter the analysis. The role enhancement is a purely fact-based determination, based solely on the conspirator's level of involvement in the conspiracy. A conspirator's decision to cooperate with authorities may entitle them to other guideline reductions, such as a credit for acceptance of responsibility, or even warrant a departure, but it cannot alter the extent of their involvement or the points that are assigned as a result of that involvement.

Because the facts elicited at trial do not warrant a role adjustment for Appellant, the matter should be remanded for sentencing with instructions to eliminate the two-point enhancement.

## CONCLUSION

For the foregoing reasons, the conviction should be vacated. In the alternative, the matter should be remanded for resentencing with instructions to eliminate the role enhancement.

Dated:        November 15, 2023

Respectfully submitted,

By:    <u>s/ James Kousouros</u>
       James Kousouros
       *Attorney for Defendant-Appellant*
       NY I.D. No. 2041549
       Law Offices of James Kousouros
       260 Madison Avenue
       22nd Floor
       New York, NY 10016
       Tel: (212) 532-1934
       james@kousouroslaw.com

# CERTIFICATE OF COMPLIANCE

I, James Kousouros, Esq., hereby certify that:

1.      I am a member of the bar of the United States Court of Appeals for the Third Circuit.

2.      The instant Brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), because it contains 7,800 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

3.      The instant Brief complies with the typeface requirements of Fed. R. App. P. (32)(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

4.      The text of the electronic Brief filed by ECF is identical to the text of the hard copies filed or to be filed with the Court.

5.      The electronic copy of the Brief has been scanned for viruses using Vipre Virus Protection, version 3.1.

Dated:      November 15, 2023

Respectfully submitted,

By:      s/ James Kousouros
James Kousouros
*Attorney for Defendant-Appellant*
NY I.D. No. 2041549
Law Offices of James Kousouros

260 Madison Avenue
22nd Floor
New York, NY 10016
Tel: (212) 532-1934
james@kousouroslaw.com

# APPENDIX

# TABLE OF CONTENTS

## Volume One

Judgment of Forfeiture (Money Judgment)
Filed June 29, 2023 ........................................................................A1

Judgment in a Criminal Case
Filed June 29, 2023 ........................................................................A5

Notice of Appeal
Filed July 11, 2023 .......................................................................A17

## Volume Two

District Court Docket Sheet ...................................................................A19

Transcript of Trial (Jury Selection) (Vol. 1) before the Hon. John Michael Vazquez
Heard July 11, 2022 .....................................................................A30

Transcript of Trial (Jury Selection) (Vol. 2) before the Hon. John Michael Vazquez
Heard July 12, 2022 ...................................................................A214

## Volume Three

Transcript of Jury Trial (Vol. 1) before the Hon. John Michael Vazquez
Heard July 13, 2022 ...................................................................A396

Transcript of Jury Trial (Vol. 2) before the Hon. John Michael Vazquez
Heard July 14, 2022 ...................................................................A595

## Volume Four

Transcript of Jury Trial (Vol. 3) before the Hon. John Michael Vazquez
Heard July 15, 2022 ...................................................................A821

Transcript of Jury Trial (Vol. 4) before the Hon. John Michael Vazquez
Heard July 18, 2022 ...................................................................A974

Transcript of Jury Trial (Vol. 5) before the Hon. John Michael Vazquez
    Heard July 19, 2022 .................................................................................A1237

Transcript of Sentencing Hearing before the Hon. John Michael Vazquez
    Heard June 29, 2023 ..............................................................................A1393

## Volume Five (Sealed)

Sentencing Memorandum
    Filed June 23, 2023 ................................................................................A1451

    Exhibit A: The Parties' Submissions on Objections to the Presentencing
    Report....................................................................................................A1485

    Exhibit B: Agresti Plea Agreement.......................................................A1497

    Exhibit C: Frazzano Plea Agreement ....................................................A1507

    Exhibit D: Figueroa Plea Agreement.....................................................A1517

    Exhibit E: Letters in Support of Mr. Puccio .........................................A1528

    Exhibit F: Mr. Puccio's Letter to Court ................................................A1545

2021R00340/ES/SB/SD

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. John Michael Vazquez |
| v. | : | Crim. No. 21-157 |
| MATTHEW PUCCIO, | : | <u>JUDGMENT OF FORFEITURE</u> |
| | | <u>(MONEY JUDGMENT)</u> |
| Defendant. | : | |

WHEREAS, on or about February 17, 2021, a federal grand jury sitting in the District of New Jersey returned a one-count Indictment (the "Indictment"), which charged Matthew Puccio (the "defendant") with healthcare fraud conspiracy, contrary to 18 U.S.C. § 1347, in violation of 18 U.S.C. § 1349 (Count One);

WHEREAS, the Indictment contained a forfeiture allegation, which provided that, pursuant to 18 U.S.C. § 982(a)(7), upon the defendant's conviction of the Federal health care offense charged in the Indictment, the United States will seek the forfeiture of any and all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense;

WHEREAS, on July 19, 2022, a federal petit jury sitting in the District of New Jersey found the defendant guilty of Count One of the Indictment;

WHEREAS, as a result of the defendant's conviction of the Federal health care offense charged in Count One of the Indictment, the Court is required to sentence the defendant to forfeit to the United States, pursuant to 18 U.S.C.

1

A1

§ 982(a)(7), any gross proceeds the defendant obtained, directly or indirectly, as the result of such offense;

WHEREAS, based on the evidence adduced at trial, and for the reasons set forth on the record, the Court finds by a preponderance of the evidence that the United States has established that, as a result of the commission of the Federal health care offense of which the defendant was convicted, the defendant actually obtained proceeds totaling $213,445.53;

WHEREAS, the Court finds that $213,445.53 is subject to forfeiture pursuant to 18 U.S.C. § 982(a)(7) as property constituting or derived from the gross proceeds obtained, directly or indirectly, from the offense charged in Count One of the Indictment;

WHEREAS, Rule 32.2(c)(1) of the Federal Rules of Criminal Procedure provides that no ancillary proceeding is required to the extent that the forfeiture consists of a money judgment; and

WHEREAS, good and sufficient cause has been shown, it is hereby

ORDERED, ADJUDGED, AND DECREED AS FOLLOWS:

1.      Pursuant to 18 U.S.C. § 982(a)(7) and Rule 32.2(b)(1) of the Federal Rules of Criminal Procedure, based upon the evidence presented at trial, and for the reasons stated in this Order and on the record, the Court finds that the Government has proven by a preponderance of the evidence that the defendant is liable for a personal money judgment in the amount of $213,445.53, representing the amount of gross proceeds obtained by the defendant as a

A2

result of the commission of the Federal health care offense charged in Count One of the Indictment.

2.      A criminal forfeiture money judgment in the amount of $213,445.53 (the "Money Judgment") is hereby entered against the defendant, pursuant to 18 U.S.C. § 982(a)(7) and Federal Rule of Criminal Procedure 32.2(b).

3.      All payments on the Money Judgment shall be made by (i) electronic funds transfer, as directed by the United States Attorney's Office; or (ii) postal money order, bank or certified check, made payable, in this instance to the United States Marshals Service, and delivered by mail to the United States Attorney's Office, District of New Jersey, Attn: Asset Forfeiture and Money Laundering Unit, 970 Broad Street, 7th Floor, Newark, New Jersey 07102, and shall indicate the defendant's name and case number on the face of the check.

4.      The Money Judgment may be satisfied with proceeds, or, if the requisite showing is made pursuant to 21 U.S.C. § 853(p), substitute assets. All payments on the Money Judgment shall be forfeited to the United States of America as substitute assets, pursuant to 21 U.S.C. § 853(p).  Until the defendant is sentenced, the United States Marshals Service shall deposit all payments on the Money Judgment in its Seized Assets Deposit Account.  After the defendant is sentenced and the Judgment is entered on the docket, all payments on the Money Judgment shall be forfeited to the United States of

3

A3

America as substitute assets, pursuant to 21 U.S.C. § 853(p), and shall be deposited in the Assets Forfeiture Fund.

5.      When the Money Judgment is fully satisfied, the United States shall file a Satisfaction of the Money Judgment.

6.      Pursuant to Federal Rule of Criminal Procedure 32.2(b)(3) and 21 U.S.C. § 853(n), upon entry of this Order, and until this the Money Judgment is fully satisfied, the United States Attorney's Office is authorized to conduct any discovery needed to identify, locate, or dispose of substitute assets to satisfy this Money Judgment, or in connection with any petitions filed with regard to substitute assets, including depositions, interrogatories, requests for production of documents, and the issuance of subpoenas.

7.      This Order shall be deemed part of the sentence of the defendant and shall be included in the judgment of conviction therewith.

8.      The Clerk of the Court is directed to enter a money judgment against the defendant in favor of the United States in the amount of $213,445.53.

9.      This Court shall retain jurisdiction to enforce this Order and to amend it as necessary.

ORDERED this 29th day of   June                , 2023.


_____
HON. JOHN MICHAEL VAZQUEZ
United States District Judge


4

A4

AO 245B (Mod. D/NJ 12/06) Sheet 1 - Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## District of New Jersey

UNITED STATES OF AMERICA

     v.

MATTHEW PUCCIO

     Defendant.

**CASE NUMBER    2:21-CR-00157-JMV-1**

### JUDGMENT IN A CRIMINAL CASE
**(For Offenses Committed On or After November 1, 1987)**

The defendant, MATTHEW PUCCIO, was represented by ROGER MARION, ESQ. and JAMES KOUSOUROS, ESQ.

The defendant was found guilty on count(s) 1 by a jury verdict on 7/19/2022 after a plea of not guilty.  Accordingly, the court has adjudicated that the defendant is guilty of the following offense(s):

| Title & Section | Nature of Offense | Date of Offense | Count Number(s) |
|---|---|---|---|
| 18:1349 | CONSPIRACY TO COMMIT HEALTH CARE FRAUD | 11/2014 - 3/2016 | 1 |

As pronounced on June 29, 2023, the defendant is sentenced as provided in pages 2 through 8 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is ordered that the defendant must pay to the United States a special assessment of $100.00 for count(s) 1, which shall be due immediately.  Said special assessment shall be made payable to the Clerk, U.S. District Court.

It is further ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States Attorney of any material change in economic circumstances.

Signed this 29th day of June, 2023.



John Michael Vazquez,
U.S. District Judge

**TRUE AND CERTIFIED COPY**
**Austin Schoenig**
**11:07 am, Jun 30 2023**

07869

A5

AO 245B (Mod. D/NJ 12/06) Sheet 2 - Imprisonment

Defendant: MATTHEW PUCCIO                                                      Judgment - Page 2 of 8
Case Number: 2:21-CR-00157-JMV-1

## IMPRISONMENT

      The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 60 months.

      The Court makes the following recommendations to the Bureau of Prisons: designation to a facility for service of this sentence as near as possible to defendant's home address.

      The defendant will surrender for service of sentence at the institution designated by the Bureau of Prisons upon designation but not before September 11, 2023. The Court further recommends that the BOP conduct an evaluation of Defendant as to potential alcohol abuse.

## RETURN

      I have executed this Judgment as follows:

_____

_____

_____

_____

      Defendant delivered on _____ To _____

At _____, with a certified copy of this Judgment.

                                 _____
                                       United States Marshal

                            By _____
                                      Deputy Marshal

A6

AO 245B (Mod. D/NJ 12/06) Sheet 3 - Supervised Release

Judgment - Page 3 of 8

Defendant: MATTHEW PUCCIO
Case Number: 2:21-CR-00157-JMV-1

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of 3 years.

Within 72 hours of release from custody of the Bureau of Prisons, you must report in person to the Probation Office in the district to which you are released.

While on supervised release, you must not commit another federal, state, or local crime, must refrain from any unlawful use of a controlled substance and must comply with the mandatory and standard conditions that have been adopted by this court as set forth below.

You must submit to one drug test within 15 days of commencement of supervised release and at least two tests thereafter as determined by the probation officer.

You must cooperate in the collection of DNA as directed by the probation officer

If this judgment imposes a fine, special assessment, costs, or restitution obligation, it is a condition of supervised release that you pay any such fine, assessments, costs, and restitution that remains unpaid at the commencement of the term of supervised release.

You must comply with the following special conditions:

FINANCIAL DISCLOSURE

Upon request, you must provide the U.S. Probation Office with full disclosure of your financial records, including co-mingled income, expenses, assets and liabilities, to include yearly income tax returns. With the exception of the financial accounts reported and noted within the presentence report, you are prohibited from maintaining and/or opening any additional individual and/or joint checking, savings, or other financial accounts, for either personal or business purposes, without the knowledge and approval of the U.S. Probation Office. You must cooperate with the U.S. Probation Officer in the investigation of your financial dealings and must provide truthful monthly statements of your income. You must cooperate in the signing of any authorization to release information forms permitting the U.S. Probation Office access to your financial records.

MENTAL HEALTH TREATMENT

You must undergo treatment in a mental health program approved by the U.S. Probation Office until discharged by the Court. As necessary, said treatment may also encompass treatment for gambling, domestic violence and/or anger management, or sex offense-specific treatment, as approved by the U.S. Probation Office, until discharged by the Court. The U.S. Probation Office will supervise your compliance with this condition.

NEW DEBT RESTRICTIONS

You are prohibited from incurring any new credit charges, opening additional lines of credit, or incurring any new monetary loan, obligation, or debt, by whatever name known, without the approval of the U.S. Probation Office. You must not encumber or liquidate interest in any assets unless it is in direct service of the fine and/or restitution obligation or otherwise has the expressed approval of the Court.

SELF-EMPLOYMENT/BUSINESS DISCLOSURE

You must cooperate with the U.S. Probation Office in the investigation and approval of any position of self-employment, including any independent, entrepreneurial, or freelance employment or business activity. If approved for self-employment, you must provide the U.S. Probation Office with full disclosure of your self-employment and other business records, including, but not limited to, all of the records identified in the Probation Form 48F (Request for Self-Employment Records), or as otherwise requested by the U.S. Probation Office.

SUPPORTING DEPENDENTS

A7

AO 245B (Mod. D/NJ 12/06) Sheet 3 - Supervised Release

Judgment - Page 4 of 8

Defendant: MATTHEW PUCCIO
Case Number: 2:21-CR-00157-JMV-1

If you are Court-ordered to make child support payments or to make payments to support a person caring for a child, you must make the payments and comply with the other terms of the order.

ALCOHOL TESTING AND TREATMENT

You must refrain from the use of alcohol and must submit to urinalysis or other forms of testing to ensure compliance. It is further ordered that you must submit to evaluation and treatment, on an outpatient or inpatient basis, as approved by the U.S. Probation Office. You must abide by the rules of any program and must remain in treatment until satisfactorily discharged by the Court. You must alert all medical professionals of any prior substance abuse history, including any prior history of prescription drug abuse. The U.S. Probation Office will supervise your compliance with this condition.

AO 245B (Mod. D/NJ 12/06) Sheet 3a - Supervised Release

Judgment - Page 5 of 8

Defendant: MATTHEW PUCCIO
Case Number: 2:21-CR-00157-JMV-1

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1)  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.

2)  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.

3)  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.

4)  You must answer truthfully the questions asked by your probation officer.

5)  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

6)  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

7)  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have fulltime employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8)  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

9)  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

10) You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e.. anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

11) You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

12) If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.

A9

AO 245B (Mod. D/NJ 12/06) Sheet 3a - Supervised Release

Judgment - Page 6 of 8

Defendant: MATTHEW PUCCIO
Case Number: 2:21-CR-00157-JMV-1

## STANDARD CONDITIONS OF SUPERVISION

13) You must follow the instructions of the probation officer related to the conditions of supervision.

*For Official Use Only - - - U.S. Probation Office*

Upon a finding of a violation of probation or supervised release, I understand that the Court may (1) revoke supervision or (2) extend the term of supervision and/or modify the conditions of supervision.

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.

You shall carry out all rules, in addition to the above, as prescribed by the Chief U.S. Probation Officer, or any of his associate Probation Officers.

(Signed)_____

                     Defendant                               Date

_____

     U.S. Probation Officer/Designated Witness           Date

A10

AO 245B (Mod. D/NJ 12/06) Sheet 6 - Restitution and Forfeiture

Judgment - Page 7 of 8

Defendant: MATTHEW PUCCIO
Case Number: 2:21-CR-00157-JMV-1

## RESTITUTION AND FORFEITURE

### RESTITUTION

The defendant shall make restitution in the amount of $2,650,000.00. The Court will waive the interest requirement in this case. Payments should be made payable to the **U.S. Treasury** and mailed to Clerk, U.S.D.C., 402 East State Street, Rm 2020, Trenton, New Jersey 08608, for distribution to New Jersey State Health Benefits Program, TBD.

The amount ordered represents the total amount due to the victim for this loss. The defendant's restitution obligation shall not be affected by any restitution payments made by other defendants in this case, except that no further payments will be required once payment(s) by one or more defendants fully satisfies the victim's loss. The following defendant(s) in the following case(s) may be subject to restitution orders to the same victims for this same loss:

| | |
|---|---|
| Robert Agresti | 2:2018cr363 |
| Peter Frazzano | 2:2019cr560 |
| Jennifer Figueroa | 2:2022cr745 |

The restitution is due immediately. It is recommended that you participate in the Bureau of Prisons Inmate Financial Responsibility Program (IFRP). If you participate in the IFRP, the restitution will be paid from those funds at a rate equivalent to $25 every 3 months. In the event the entire restitution is not paid prior to the commencement of supervision, you must satisfy the amount due in monthly installments of no less than $200, to commence 30 days after release from confinement. Interest is waived.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

A11

AO 245B (Mod. D/NJ 12/06) Sheet 6 - Restitution and Forfeiture

Judgment - Page 8 of 8

Defendant: MATTHEW PUCCIO
Case Number: 2:21-CR-00157-JMV-1

## RESTITUTION AND FORFEITURE

### FORFEITURE

The defendant is ordered to forfeit the following property to the United States:

Separate order of forfeiture issued.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

A12

SEALED DOCUMENT PAGES A13-A16 REMOVED

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

Full Caption in District Court:                    Docket No.: 21 Cr. 157 (JMV)

United States
       (Plaintiff)                                   Judge: John Michael Vazquez

          v.                                **Notice of Appeal to the**
Matthew Pucico                                     **U.S. Court of Appeals for the**
      (Defendant)                                  **Third Circuit**

Notice is hereby given that **Matthew Puccio**

(Named Party)

appeals to the United States Court of Appeals for the Third Circuit from

[X] Judgment, [ ] Order, [X] Other **Conviction**

(Specify)

of the United States District Court, District of New Jersey, entered in this action on

**June 29, 2023**

(Date)

Dated: July 10, 2023                               Matthew Puccio c/o James Kousouros, Esq.

Appellant

Law Offices of James Kousouros 260 Madison Avenue, 22nd Floor

Street

**New York, NY 10016**

City, State, Zip

**(212) 532-1934**

Telephone

A17

## JAMES KOUSOUROS
*ATTORNEY AT LAW*

**JAMES KOUSOUROS**
FOUNDER & PRINCIPAL

260 Madison Avenue, 22nd floor • New York, NY 10016
212•532•1934 / 212•532•1939 fax
E-mail: James@kousouroslaw.com

**EVAN L. LIPTON**
COUNSEL

**EMMA J. COLE**
LEGAL ASSISTANT

July 10, 2023

<u>By FedEx</u>

Attn: Clerk of Court
District of New Jersey
Martin Luther King Building
& U.S. Courthouse
50 Walnut Street Room 4015
Newark, NJ 07101

Re:    ***United States v. Matthew Puccio*, 21 Cr. 157 (JMV)**
**Notice of Appeal to the U.S. Court of Appeals for the Third Circuit**

Dear Clerk of Court:

Enclosed herewith please find a Notice of Appeal on behalf of Matthew Puccio in reference to the above-captioned matter. Also enclosed is a check in the amount of $505.00 for the filing fee.

Thank you for your consideration.

Respectfully submitted,

**RECEIVED**

JUL 1 1 2023

AT 8:30 _2:36_ PM pnm
CLERK, U.S. DISTRICT COURT - DNJ

/s/ James Kousouros
James Kousouros, Esq.
Counsel for Matthew Puccio
Law Offices of James Kousouros
260 Madison Avenue
22nd Floor
New York, NY 10016
(212) 532-1934
james@kousouroslaw.com

Encl.

A18

## CERTIFICATE OF SERVICE

I, James Kousouros, hereby certify that on this 15th day of November 2023, a copy of the foregoing Corrected Brief and Appendix for Appellant was electronically filed with the Third Circuit Court of Appeals, and service was made upon counsel of record through the Court's electronic docketing system.

Dated:  November 15, 2023        /s/ James Kousouros
                                              James Kousouros

                                              *Counsel for Appellant*