No. 23-2260

IN THE
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

UNITED STATES OF AMERICA

v.

MATTHEW PUCCIO,

Appellant

Appeal from the Final Judgment in a Criminal Case of the United
States District Court for the District of New Jersey (Crim. No. 21-
157). Sat Below: Honorable John Michael Vazquez, U.S.D.J.

---

## BRIEF FOR APPELLEE

---

PHILIP R. SELLINGER
UNITED STATES ATTORNEY
Attorney for Appellee
970 Broad Street
Newark, New Jersey 07102-2535
(973) 645-2700

On the Brief:

Richard J. Ramsay
Assistant U.S. Attorney
(973) 645-2712

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ......................................................... iii

TABLE OF ABBREVIATIONS.................................................. vi

JURISDICTIONAL STATEMENT.......................................... 1

STATEMENT OF THE ISSUES ................................................ 1

STATEMENT OF RELATED CASES AND PROCEEDINGS .................. 2

STATEMENT OF THE FACTS AND OF THE CASE................................ 3

   I.  OVERVIEW ................................................................ 3

   II.  FACTUAL BACKGROUND ............................................ 4

       A.   The Health Care Fraud Conspiracy ............................. 4

       B.   The Defense ................................................... 10

   III.  THE SENTENCING................................................ 13

SUMMARY OF ARGUMENT ................................................ 16

ARGUMENT ......................................................... 17

   I.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY GIVING THIS COURT'S MODEL WILLFUL BLINDNESS INSTRUCTION WHERE PUCCIO TESTIFIED AND DENIED KNOWLEDGE OF THE HEALTH CARE FRAUD THAT WAS THE OBJECT OF THE CHARGED CONSPIRACY AND DELIBERATELY CLOSED HIS EYES TO EVIDENCE OF THAT FRAUD. ..... 17

       A.   Legal Standard ........................................... 18

B.    The Evidence Supported A Willful Blindness Instruction........... 20

C.    The Willful Blindness Charge Was Legally Sufficient. ............... 24

II.  THE DISTRICT COURT DID NOT CLEARLY ERR BY IMPOSING AN AGGRAVATING ROLE ENHANCEMENT FOR BEING A MANAGER OR SUPERVISOR IN THE HEALTH CARE FRAUD CONSPIRACY. .................... 29

A.    Legal Standard ........................................................................ 29

B.    The Record Supports The Finding That Puccio Was A Manager Or Supervisor Of The Scheme. .................................................. 30

CONCLUSION.......................................................................................... 37

# TABLE OF AUTHORITIES

CASES                                                                      PAGE(S)

*DiFederico v. Rolm Co.,*
  201 F.3d 200 (3d Cir. 2000) ................................................ 34

*Gall v. U.S.,*
  552 U.S. 38 (2007) ........................................................ 30

*Global-Tech Appliances, Inc. v. SEB S.A.,*
  563 U.S. 754 (2011) ..................................................... 18, 24

*Greer v. U.S.,*
  593 U.S. 503 (2021) ....................................................... 26

*Johnson v. U.S.,*
  520 U.S. 461 (1997) ....................................................... 26

*Perrin v. U.S.,*
  444 U.S. 37 (1979) ........................................................ 30

*U.S. v. Adair,*
  38 F.4th 341 (3d Cir. 2022) ........................................... passim

*U.S. v. Adeniji,*
  31 F.3d 58 (2d Cir. 1994) ................................................. 28

*U.S. v. Brodie,*
  403 F.3d 123 (3d Cir. 2005) ............................................ 18, 19

*U.S. v. Caminos,*
  770 F.2d 361 (3d Cir. 1985) .............................................. 19

*U.S. v. Caraballo-Rodriquez,*
  726 F.3d 418 (3d Cir. 2013) .............................................. 18

*U.S. v. DeGovanni,*
  104 F.3d 43 (3d Cir. 1997) ............................................... 35

*U.S. v. Flores-Mejia,*
  759 F.3d 253 (3d Cir. 2014) .............................................. 29

*U.S. v. Green,*
517 F.3d 233 (3d Cir. 2010) ...................................................................... 17

*U.S. v. Jimenez,*
513 F.3d 62 (3d Cir. 2008) ........................................................................ 24

*U.S. v. Khorozian,*
333 F.3d 498 (3d Cir. 2003) ...................................................................... 17

*U.S. v. Leahy,*
445 F.3d 634 (3d Cir. 2006) ...................................................................... 28

*U.S. v. Lore,*
430 F.3d 190 (3d Cir. 2005) ...................................................................... 23

*U.S. v. Nasir,*
17 F.4th 459 (3d Cir. 2021) ....................................................................... 31

*U.S. v. Nucera,*
67 F.4th 146 (3d Cir. 2023) ....................................................................... 26

*U.S. v. Olano,*
507 U.S. 725 (1993) .................................................................................. 17

*U.S. v. Raia,*
993 F.3d 185 (3d Cir. 2021) ...................................................................... 30

*U.S. v. Ruiz,*
536 U.S. 622 (2002) .................................................................................. 37

*U.S. v. Ruiz,*
710 F.3d 1077 (9th Cir. 2013) ................................................................... 23

*U.S. v. Savage,*
85 F.4th 102 (3d Cir. 2023) ...................................................................17, 26

*U.S. v. Sharma,*
190 F.3d 220 (3d Cir. 1999) ...................................................................... 19

*U.S. v. Stadtmauer,*
620 F.3d 238 (3d Cir. 2010) ............................................................... passim

*U.S. v. Stewart*,
185 F.3d 112 (3d Cir. 1999) ............................................... 19, 20

*U.S. v. Tai*,
750 F.3d 309 (3d Cir. 2014) .................................................... 28

*U.S. v. Tomko*,
562 F.3d 558 (3d Cir. 2009) .................................................... 30

*U.S. v. Vitillo*,
490 F.3d 314 (3d Cir. 2007) .................................................... 29

*U.S. v. Wert-Ruiz*,
228 F.3d 250 (3d Cir. 2000) ................................... 19, 20, 21, 23

## STATUTES

18 U.S.C. § 1347 ........................................................................ 3

18 U.S.C. § 1349 ........................................................................ 3

18 U.S.C. § 3231 ........................................................................ 1

18 U.S.C. § 3553(a) ...................................................... 15, 29, 30

18 U.S.C. § 3742 ........................................................................ 1

28 U.S.C. § 1291 ........................................................................ 1

## RULES

Fed. R. Crim. P. 30(d) ............................................................ 26

## U.S. SENTENCING GUIDELINES

U.S.S.G. § 3B1.1 ............................................................ 1, 31, 34

U.S.S.G. § 3B1.1(a) ........................................................... 30, 31

U.S.S.G. § 3B1.1(b) ........................................................... passim

U.S.S.G. § 3B1.1(c)................................................................................ passim

**O**THER **A**UTHORITIES

3d Cir. Model Crim. Jury Instruction 5.06………………………...18, 19, 24, 25

**TABLE OF ABBREVIATIONS**

"A"        refers to the Appendix supplied by the Defendant.

"DB"       refers to the Defendant's Brief.

"DE"       refers to a Docket Entry in the District Court.

"PSR"      refers to the Presentence Report filed under seal with this Court.

"SA"       refers to the Supplemental Appendix supplied by the United States.

## JURISDICTIONAL STATEMENT

Matthew Puccio appeals his conviction, after trial, for conspiracy to commit health care fraud. He also challenges the procedural reasonableness of his 60-month below-Guidelines sentence. The United States District Court for the District of New Jersey (Hon. John Michael Vazquez, U.S.D.J.)[1] had subject matter jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction to review the judgment under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

(1)  (a) Did the District Court correctly instruct the jury to consider willful blindness where Puccio's testimony made the charge relevant, and (b) was the instruction legally sufficient?

(2)  Can Puccio show that the District Court clearly erred at sentencing by applying U.S.S.G. § 3B1.1's lowest aggravating role enhancement for being a manager or supervisor of criminal activity where the trial evidence (and the court's subsequent factual findings) established that Puccio recruited his brother-in-law to join him in profiting from the charged health care fraud and taught him how to maximize their ill-gotten gains and avoid getting caught?

---

[1] Judge Vazquez has since retired from the bench.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

Puccio and four others were convicted of jointly conspiring to commit health care fraud. Co-conspirators Robert J. Agresti, Jr. (D.N.J. 18cr363), Peter Frazzano (D.N.J. 19cr560), and Christopher Blackstone (E.D. La. 20cr149) were charged in separate Informations, pled guilty, and testified at Puccio's trial as cooperating witnesses. PSR ¶¶ 1–6. Co-conspirator Jennifer Figueroa (D.N.J. 22cr745) pled guilty to an Information as well. PSR ¶¶ 9–11. Of these defendants, Frazzano and Blackstone have been sentenced. Frazzano was sentenced to three years' probation and ordered to pay $2,727,292 in restitution. In the Eastern District of Louisiana, Blackstone was sentenced to 18 months' imprisonment and two years of supervised release, and he was ordered to pay $10,689,005 in restitution.

John Cuffari (D.N.J. 20cr651) and Christopher Cuffari (D.N.J. 21cr535) were charged with conspiring to commit health care fraud involving a related scheme. The Hon. Renée Marie Bumb, U.S.D.J., sentenced John Cuffari to 17 months' imprisonment and three years of supervised release; ordered him to forfeit $539,580.57; and expects to determine restitution. The Hon. Peter G. Sheridan, U.S.D.J., sentenced Christopher Cuffari to 27 months' imprisonment and three years of supervised release; ordered him to forfeit $995,328.60; and expects to determine restitution.

The United States is not aware of any other related cases or proceedings.

## STATEMENT OF THE FACTS AND OF THE CASE

### I.   OVERVIEW

Prescriptions are supposed to originate from patient need, not greed.

Matthew Puccio and Peter Frazzano had money on their minds when they bilked the State of New Jersey's health benefits program out of $2.65 million in fraudulent reimbursements for pricey prescription scar, pain and migraine creams, among other medications, and enriched themselves with commissions from those reimbursements.   The two accomplished the fraud by recruiting insured "patients" willing to receive these compound medications, which they didn't need, and by recruiting doctors willing to sign prescriptions they didn't prepare.   In just 18 months, Puccio and Frazzano caused 200 prescriptions to be filled and profited approximately $400,000 in kickbacks between them.

When the FBI caught wind of the conspiracy, Frazzano panicked and called Puccio for help.   Puccio's advice: "[D]elete the shit off your phone," call the patients and tell them to lie if questioned.   Frazzano complied, but ultimately came clean and agreed to cooperate with the Government.

A federal grand jury in Newark, New Jersey indicted Puccio for conspiring to commit health care fraud, contrary to 18 U.S.C. § 1347, in violation of 18 U.S.C. § 1349.   DE1.   At the end of a five-day trial, a jury found Puccio guilty as charged.

3

Puccio raises two claims on appeal. He contends that the District Court erred by allowing the jury to consider willful blindness as a basis for finding that he knew that health care fraud was the object of the charged conspiracy. He also believes the court erred by applying a two-level sentencing enhancement for his role in the conspiracy. The District Court committed no error, however.

## II. FACTUAL BACKGROUND

### A. The Health Care Fraud Conspiracy

Puccio worked for Rep Network, a corrupt marketing company, as a sales representative in the health care industry. A474–75, 1072, 1074–80. In that role, he marketed compound medications—i.e., specialty medications mixed by a pharmacist to meet the specific medical needs of an individual patient. A459–60, 763–64.[2] Compound medications are expensive and require a valid prescription from a physician to be dispensed. A763–66, 852 (discussing medications costing $60,000 or $80,000), 877 (discussing medication costing $70,000). Certain insurance plans cover the medications, including plans for New Jersey state and local employees. A464, 472, 490–91,

---

[2] Although compounded drugs are not approved by the FDA, they are properly prescribed when a physician determines that an FDA-approved medication does not meet the health needs of a particular patient, such as if a patient is allergic to a dye or other ingredients in the prescription. A460, 763–64.

780–87; *see* A1077–78, 1111–12.

Puccio made money from Rep Network on commission: He received a percentage of every prescription that the insurance company paid out.   A510, 641–43, 692–93, 744–45, 752–53, 848, 1081–82, 1110–13.   He learned which medications had the highest insurance reimbursement rates and used them to procure prescriptions as well as multiple refills that enabled him to maintain a steady stream of income.   A498–504, 684–85, 688–89.   A prescription for a single month's worth of certain compound medication reimbursed for approximately $28,000, for example.   A720–22; *see* A687, 1055–64.   Puccio identified "patients" with health insurance from the State of New Jersey willing to receive the medications in exchange for a bribe: co-pay reimbursement.   A470 (the highest co-pays were hundreds of dollars), 490–96, 780.   And he identified doctors willing to sign pre-filled prescriptions without asking questions or examining the patients.   A488–89, 495–97, 544–47, 558–59, 626–28, 684–87, 1137–38.   Upon receiving the prescriptions, the pharmacies billed the insurance plan and the plan reimbursed the pharmacies for the medications.   A681–83, 760–65, 780–87.   The pharmacies paid Puccio handsome kickbacks in return.   A475, 510, 681–82, 692–93, 751, 1111–13.

In late 2014, Puccio approached his brother-in-law, Peter Frazzano, to obtain prescriptions for various compound medications for Frazzano and his wife.   A463–64; *see* A1094–96.   Frazzano was a principal at a New Jersey public elementary school.   A462.   As Frazzano testified at trial, A461–543,

5

Puccio explained that Frazzano's health insurance would cover the prescriptions and that Puccio would personally reimburse him for any co-pays, A464. Frazzano gave Puccio his insurance card and, a few weeks later, the prescribed compound medications (pain, scar and migraine creams and a multivitamin) arrived in the mail to Frazzano. A464–69. Frazzano's wife also began receiving similar unnecessary medications. A471, 932–34.

Behind the scenes, Dr. Robert J. Agresti, Jr.—with whom the Frazzanos had no doctor-patient relationship—had signed their prescriptions. A465, 471–72, 932–33. A sales representative who worked with Puccio paid him $300 for every prescription he signed for a compound medication, including ones marketed by Puccio to the Frazzanos. *See* A546–47, 550–62, 601–05, 608–09; PSR ¶ 36. Dr. Agresti prescribed these medications not because they were medically necessary or based on bona fide relationships he had with patients, but because of the bribes he was receiving. *See id.* Puccio in turn made a commission off the prescriptions Dr. Agresti signed. *Compare* A557–60 (Dr. Agresti's testimony that sales representatives commonly wrote their names on prescription forms "to get paid"), *with* A565–66 (District Court acknowledgement that "Matt" is written at the top of Exhibit 101A, a November 2014 prescription-related medical history form for Frazzano's wife).

Puccio recruited Frazzano to become a Rep Network sales representative knowing that he would make a percentage of any commissions that Frazzano earned. A510, 687, 1081–82, 1094–96, 1111–13, 1117–20, 1131–38. To

6

maximize the scheme's profits, Puccio and Frazzano needed two things: "patients" with the right insurance, and a doctor's signature on the prescriptions.  A464, 472, 490–91, 495–96, 511–12, 516, 864, 1093, 1111–12. Thus, Puccio and Frazzano agreed that they would target faculty and staff at Frazzano's school to receive these medications.  A490–94, 623–28, 760–61. Puccio also recruited his mother-in-law—also a teacher—to receive compound medications.  A492–94, 601–05, 651–59, 1055–64, 1133–34.  Puccio and Frazzano agreed to cover the patients' co-pays (as Puccio had for Frazzano), which maximized the chances the patients would agree to receive these expensive medications even though they didn't need them (nor could they afford the medications)—and to do so on an ongoing basis.  A464, 470, 498–504, 507–09, 850, 874–75, 1003–04.

Puccio realized that the fastest and easiest way to make money on this scheme was to identify a doctor who would be willing to sign prescriptions he (Puccio) and Frazzano would have prepared ahead of time—and to sign them without physically examining the patients.  A492–94.  After all, patient exams would slow things down.  *See* A490–91, 498–501.  So Puccio commissioned Frazzano to find an agreeable doctor, and the search yielded Dr. Gregg Marella.  A488–89.

Critical aspects of the fraud took place at restaurant dinners with Dr. Marella.  At the dinners, which Puccio and Frazzano arranged and paid for, the two would bring envelopes of pre-filled prescriptions for Dr. Marella to

sign and submit to compounding pharmacies that were in on the scheme.
A492–94, 511–13, 516, 623–28, 639.  One of those dinners occurred on
October 21, 2015.  A838 (Exhibit 301A: Puccio's October 2015 bank
statement); *see* A1114–15 (Puccio acknowledging bank account entries for
dinner in Exhibit 301A).  Dr. Marella signed and faxed the prescriptions
Puccio and Frazzano gave him to a compounding pharmacy that same
evening, A627–34:

Within two days of that dinner, 11 prescriptions were filled.   A629–34, 908–11.

Dr. Marella never examined any of the teachers in connection with writing these prescriptions, A623–59, a practice Puccio and Frazzano were "well aware" of, A497.   On one occasion, the two paid Dr. Marella a $500 cash bribe to induce him to continue writing prescriptions.   A497–98, 660.

Throughout the scheme, Puccio instructed Frazzano on various ways to increase their commissions.   These included: marketing medications that would earn them the most money and maximizing the number of refills on each prescription.   A498–504, 511–13, 516, 605, 629–59, 684–89.   As witnesses testified at trial, these techniques were used throughout the conspiracy, including by individuals at Prime Pharmacy (whose CEO testified), a corrupt compounding pharmacy, and by other co-conspirators, like the president of Rep Network.   A681–89, 751–52; *see* A516–17.

In September 2017, FBI agents confronted Frazzano at his house.   A517–18, 937–38.   As soon as they left, Frazzano called Puccio and told him what had just happened.   A519, 915–16, 938.   Puccio immediately drove to Frazzano's home.   A519, 918–22, 938, 1120–25.   After conferring by phone with Rep Network's president, Puccio instructed Frazzano to call the teachers and tell them to lie to the FBI by stating: (1) they had received the medications; (2) they had seen the prescribing doctor; and (3) nobody had paid them to get the medications.   A520–22, 939.   Frazzano did as he was told.   A522, 852,

9

884, 886, 939, 1005–06.   Puccio also instructed Frazzano to delete all communications related to compounding on his phone.   A521.   When Frazzano appeared too nervous to follow through, Puccio took Frazzano's phone and deleted the messages himself.   *Id.*

Puccio pocketed approximately $213,000 from the scheme and Frazzano $184,000, totaling nearly $400,000 in criminal proceeds.   A2–3, 900–05, 1423; *see* A1144–45 (Puccio admitting that he collected "over $200,000 by compounding pharmacies in just 18 months").   Their joint efforts caused the New Jersey state insurance plan to pay out more than $2.65 million for nearly 200 medically unnecessary compound medications.   A780–88, 1437; PSR ¶ 44.

## B.   The Defense

Puccio called a high school friend, A1010–17, his wife, A1018–33, and his mother-in-law, A1034–67, to testify in his defense, then took the witness stand and perjured himself, A1070–1153.   He admitted to knowing Frazzano and his wife, A1081–82; joining Rep Network as a sales representative, A1082; understanding the process for "register[ing]" doctors and getting paid for approved prescriptions, A1083, 1094–96; arranging dinners with Frazzano and Dr. Marella that yielded prescriptions for expensive compounding medications, A1113–14; and splitting 50/50 any commissions obtained through prescriptions from Dr. Marella, A1117.

10

But Puccio denied knowing anything about the underlying health care fraud.   He denied recruiting Frazzano as a sales representative, claiming only to have "introduc[ed]" Frazzano to Rep Network.   A1080–81 (claiming that he introduced Frazzano to another sales rep and that he didn't "know exactly what transpired after that"), 1094.   He denied filling out the prescription forms with the patients' information and the medications they should receive before placing them—and on one occasion, $500 cash—in envelopes and handing them to Dr. Marella for signature.   A1092–93 (direct examination); *see* A1114 (cross-examination: "I did not hand him [Dr. Marella] envelopes.").

These forms were the subject of rigorous cross-examination.   Puccio claimed the prescription forms (or pads) he and Frazzano gave to Dr. Marella were blank—contrary to the testimony of Frazzano and Dr. Marella.   *Compare id.*, *with* A492–94, 511–12, 516 (prescription forms were pre-filled according to Frazzano), *and* 626–28 (same, according to Dr. Marella).   And he denied placing his initials or "Rep ID" on the bottom of the prescriptions.   A1095; *see infra* p. 12.   When confronted with his own rep code—"MPUC"—on cross-examination, however, Puccio admitted that the Rep Network training forms directed the representatives themselves to note their code on the prescriptions to receive proper credit for the prescriptions.   *Compare* A1117–20, *with* A559, 634–37, 641–43 (discussing Exhibit 111, a prescription bearing Puccio's rep code), 687, 934–35, *and*:

103814

*PLEASE ATTACH DEMOGRAPHIC SHEET AND COPY OF INSURANCE CARD FRONT AND BACK

Spoke with
Patient verified
in 63 Rx
10-27-15
10-12:44pm
gm

FAX RX TO: (985) 641-2300

CUSTOMER SERVICE: (844) 774-6300

### Patient Information

Name  Cristina Frazzano
Address  Old Chimney Rd.
Diagnosis
Type of Coverage: □ Insurance   □ Worker's Comp   □ Cash
Insurance Carrier: MEDCO
RxGroup#: NJ State

Best Phone  973-349-___
City/State/Zip  Randolph, NJ 07869
Allergies  None                        SS# / DL#
ICD 9 Codes/DX
Member ID: NJ73HZN15282100    Phone: 1-800 922-1557
RxBIN:  G1OO14                RxPCN:

### METABOLIC BOOSTER

☒ 5-MTHF 10 Mg, Coenzyme Q-10 100 Mg, Alpha Lipoic Acid 300 Mg, Vitamin D3 1000 IU, Methylcobalamin 20 Mg, Pyridoxal-5-Phosphate 70 Mg

SIG: TAKE 2 CAPSULES BY MOUTH 2-3 TIMES DAILY.
ALT SIG: _____    DAY SUPPLY: (30)    60    90    REFILLS: __5__

### SCAR REDUCTION / STRETCH MARKS

☒ Fluticasone 1%, Hyaluronic Acid 2%, Levocetrizine 2%, Pentoxifylline 0.5%, Prilocaine 3%, Gabapentin 15%, Pracasil-Plus

SIG: APPLY topically 1-3 GRAM(S) TO AFFECTED AREA(S) 3-4 TIMES PER DAY.
ALT SIG: _____    DAY SUPPLY: (30)    60    90    REFILLS: __5__

☐ DermaSilikRx SDS Pak
Triamcinolone Acetonide 0.1%, Dimethicone 5%

SIG: APPLY 2 ML ( ½ tsp) OF DIMETHICONE COMBINED WITH 1.33 GM ( ¼ tsp) OF TRIAMCINOLONE CREAM TO AFFECTED AREA UP TO 4 TIMES A DAY. APPLY TAPE OVER AREA NIGHTLY OR AFTER EACH APPLICATION AS DIRECTED.
ALT SIG: _____    2 BOXES = 30 DAY SUPPLY    REFILLS: _____

### MUSCULOSKELETAL PAIN / INFLAMMATION / JOINT PAIN

☒ Ketoprofen 10%, Gabapentin 6%, Bupivacaine 5%, Fluticasone 2%, Baclofen 2%, Cyclobenzaprine 2%, Clonidine 0.2%, Active Max

☐ Flurbiprofen 20%, Baclofen 2%, Clonidine 0.2%, Gabapentin 10%, Lidocaine 5%, Active Max

☐ Amantadine 8%, Diclofenac Sod. 3%, Baclofen 2%, Cyclobenzaprine 2%, Gabapentin 10%, Bupivacaine 5%, Pentoxifylline 10%, Active Max

SIG: APPLY TOPICALLY 1-3 GRAM(S) TO AFFECTED AREA(S) 3-4 TIMES PER DAY.
ALT SIG: _____    DAY SUPPLY: (30)    60    90    REFILLS: __5__

### WOUND

☐ Mupirocin 5%, Itraconazole 5%, Fluticasone 1%, Urea 20%

SIG: APPLY TOPICALLY ½ TEASPOON ( 4 GRAMS ) OR ENOUGH CREAM TO PACK WOUND 3 - 4 TIMES DAILY.
ALT SIG: _____    DAY SUPPLY: 30    60    90    REFILLS: _____

### HEMORRHOID

☐ Nifedipine 0.2%, Levocetirizine 1%, Fluticasone 1%, Lidocaine 2%, Hyaluronic Acid 0.5%, Pracasil-Plus

SIG: APPLY / INSERT 1-2 GRAM(S) TO RECTAL AREA WITH GLOVED FINGER 2 TIMES PER DAY.
ALT SIG: _____    DAY SUPPLY: 30    60    90    REFILLS: _____

### PRESCRIBER INFORMATION

Physician's Name  Gregg G. Marella, MD
Address  19 E. Main St.
DEA#  BM5176878
PRESCRIBER'S SIGNATURE  Gregg G Marella, MD

Phone  973-543-6505
City/State/Zip  Mendham, NJ 07945
NPI  1922116326
DATE  10/27/15

* Patients always have a choice of Pharmacy. Formulations and indications listed herein are provided only as a reference and have not been evaluated by the U.S. Food and Drug Administration. Prescribers should contact a pharmacist to discuss patient-specific concerns. This is for physician recommendation only.
*Refills- if left blank default is 5*

GOVERNMENT
EXHIBIT
108

12

Puccio claimed that he lost faith in Rep Network after the FBI confronted him. Supposedly, that's when he "realized that a lot of the things [he] was taught about Rep Network weren't true." A1109–10.

## III. THE SENTENCING

In preparation for sentencing, Puccio disputed the Guidelines imprisonment range calculated by the U.S. Probation Office and by the Government. The Probation Office and the Government recommended a three-level enhancement under U.S.S.G. § 3B1.1(b) for Puccio's role as manager or supervisor (but not an organizer or leader) of criminal activity involving five or more participants. PSR ¶ 73 & p. 32; SA11–14.

As evidence of that role, the Government drew the District Court's attention to Frazzano's testimony that Puccio recruited and trained him with respect to the methods of the fraud and testimony from other witnesses establishing that Puccio managed at least some aspects of the scheme. A1399–1402; SA11–14. For example, he directed Frazzano to recruit teachers and other employees at the school where he worked. *Compare* A1401, *and* SA13, *with* A490–94, 623–28, *and* 760–61. He instructed Frazzano to cover the co-pays to entice the educators to sign up for the prescriptions and to maximize profits by upselling them. *Compare* A1401, *and* SA13, *with* A464, 470, 498–504, 507–13, 516, 605, 629–59, 684–89, 850, 874–75, *and* 1003–04. The Government also relied on evidence showing that Puccio received a portion of compensation for all the prescriptions that

13

Frazzano caused to be billed and monitored their commissions. *Compare* A1400, *and* SA11, 14, *with* A510, 908–11, 1131–39, *and infra* p.32 n.9.

Puccio objected to the enhancement. A1459–63, 1487–88. He argued that he was a subordinate of the scheme and not the scheme's architect and that no one "worked for or under" his direction; the loss amount attributable to Puccio was less than the loss amounts attributable to each of his three co-defendants; he participated in the conspiracy for less time than other co-conspirators; and none of the co-conspirators who pled guilty were assigned aggravating roles in their plea agreements. *Id.*; PSR pp. 31–32.

At sentencing, after permitting argument on the issue, A1399–1402 (Government), A1406–10 (defense counsel), the District Court applied a two-level enhancement under § 3B1.1(c) instead of the recommended three-level enhancement under subsection (b). The court found that the scheme involved at least five criminally culpable individuals, or participants. A1416. And the court found that even though Puccio didn't supervise Rep Network's president, the pharmacies or the doctors, he supervised at least one criminally culpable participant: Frazzano. A1415–19. Specifically, the court found that:

- Puccio recruited Frazzano into the scheme;

- by Puccio's own e-mail admission, Frazzano "work[ed] directly under me";

- in disputes about commission owed to Frazzano, Puccio defended Frazzano and his own right to 50% of Frazzano's sales as a result of that relationship;

14

- Puccio directed Frazzano to approach teachers from his school with the appropriate insurance and to cover the co-pays;

- Puccio fought for Frazzano's commission and his own cut of that commission;

- Frazzano turned to Puccio for guidance and advice when the FBI confronted Frazzano; and

- Puccio advised and guided Frazzano how to cover their tracks.

A1415–18.   Even though, as the District Court acknowledged, these findings triggered the three-level enhancement under § 3B1.1(b), the court applied the two-level enhancement under subsection (c) "because there were so many moving parts" to the fraud.   A1418.

The District Court found a final offense level of 28 and a criminal history category of I, which resulted in a Guidelines range of 78 to 97 months' imprisonment.   A1422.   The Government recommended a downward variance to a sentence between 60 to 72 months.   A1424–25.   Defense counsel urged the court to consider that variance while asking for a greater one.   A1431.   After balancing the 18 U.S.C. § 3553(a) factors, the District Court granted the Government's requested variance and imposed a prison term of 60 months followed by a three-year term of supervised release. A1433–47.   The court also ordered Puccio to pay $2.65 million in restitution and to forfeit $213,445.53 in criminal proceeds.   A1–4, 11.

Puccio timely filed a notice of appeal.

## SUMMARY OF ARGUMENT

Contrary to Puccio's claim, the willful blindness charge given at trial was justified and comprehensive. The instruction became relevant when Puccio testified that he gave Dr. Marella blank prescription forms to complete, sign and submit. That testimony contradicted earlier testimony from Frazzano that Puccio gave Dr. Marella pre-filled prescription forms to sign and submit. Given that competing evidence, the District Court granted the Government's request to give the jury the option to convict if they believed that Puccio willfully blinded himself to the use of medically unnecessary prescriptions to commit the charged fraud. The charge tracked this Court's model charge, so this Court should not hesitate to uphold it under any standard of review.

Puccio also contends that the District Court clearly erred by applying U.S.S.G. § 3B1.1(c)'s manager/supervisor enhancement, but the record belies his claim of error. At trial, the Government elicited testimony from several witnesses establishing that Puccio recruited Frazzano into the scheme and directed Frazzano to find doctors and patients to facilitate the scheme and to obstruct justice once law enforcement got involved. The Government also introduced an e-mail Puccio wrote asserting that "Pete [Frazzano] works directly under me." All that evidence was more than sufficient to justify the enhancement and defeat his appellate claim.

This Court should affirm Puccio's conviction and sentence because the District Court did not err in any way.

# ARGUMENT

**I.** **THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY GIVING THIS COURT'S MODEL WILLFUL BLINDNESS INSTRUCTION WHERE PUCCIO TESTIFIED AND DENIED KNOWLEDGE OF THE HEALTH CARE FRAUD THAT WAS THE OBJECT OF THE CHARGED CONSPIRACY AND DELIBERATELY CLOSED HIS EYES TO EVIDENCE OF THAT FRAUD.**

**Standard of Review:**   This Court reviews for plain error unpreserved claims of instructional error.   *U.S. v. Savage*, 85 F.4th 102, 137 (3d Cir. 2023) (citing *U.S. v. Olano*, 507 U.S. 725, 730 (1993)).

This Court "exercise[s] plenary review over whether a willful blindness instruction properly stated the law."   *U.S. v. Stadtmauer*, 620 F.3d 238, 252 (3d Cir. 2010).

Finally, this Court reviews for an abuse of discretion both the "wording of instructions" and "a district court's determination that the trial evidence justified the instruction," and it "views the evidence and the inferences drawn therefrom in the light most favorable to the Government."   *Id.* (cleaned up); *U.S. v. Khorozian*, 333 F.3d 498 (3d Cir. 2003).   "An abuse of discretion occurs only where the district court's decision is arbitrary, fanciful, or clearly unreasonable."   *U.S. v. Green*, 517 F.3d 233, 239 (3d Cir. 2010) (cleaned up).

Puccio claims that the willful blindness instruction given at trial was not supported by the evidence and its substance was flawed, DB18–19, 21–27, but his trial testimony gave the District Court ample reason to give this Court's full model instruction.   The District Court gave the instruction at the Government's request and over Puccio's objection—after consulting precedential and non-precedential opinions from this Court, Third Circuit

Model Criminal Jury Instruction 5.06 and its commentary, and after considering the competing trial evidence. A1189–99, 1240–47, 1274, 1276–78. Both the decision to give the instruction and the substance of the instruction itself were correct.

## A. Legal Standard

The conspiracy charged in this case required the Government to prove that (1) two or more persons agreed to commit the health care fraud charged in the indictment; (2) Puccio was a party or a member of that agreement; and (3) he joined the conspiracy *knowing of its objective to commit the charged health care fraud*, and intending to join together with at least one other alleged conspirator to achieve that objective. A1278–79. The knowledge mental state "may be satisfied upon a showing beyond a reasonable doubt that a defendant had actual knowledge or deliberately closed his eyes to what otherwise would have been obvious to him concerning the fact in question." *U.S. v. Brodie*, 403 F.3d 123, 148 (3d Cir. 2005) (cleaned up); *accord U.S. v. Caraballo-Rodriquez*, 726 F.3d 418, 420 n.2 (3d Cir. 2013) (en banc).

This latter theory of knowledge is called willful blindness. *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011). A "willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Id.*

"When supported by the evidence," an instruction on willful blindness "should be given together with the instruction on the appropriate mental state element." 3d Cir. Model Crim. Jury Instruction ("Model Instruction") 5.06 cmt. p. 16; *see, e.g., Stadtmauer*, 620 F.3d at 259–60 (trial evidence justified the instruction). Such an instruction "ensure[s] that a juror who believe[s] that a defendant turned a blind eye towards his co-defendant's conduct w[ill] not vote to acquit the willfully blind defendant." *U.S. v. Sharma*, 190 F.3d 220, 231 (3d Cir. 1999).

In this Circuit, a legally sufficient willful blindness instruction "make[s] clear that the defendant himself was subjectively aware of the high probability of the fact in question, and not merely that a reasonable man would have been aware of the probability." *U.S. v. Wert-Ruiz*, 228 F.3d 250, 252 (3d Cir. 2000) (quoting *U.S. v. Caminos*, 770 F.2d 361, 365 (3d Cir. 1985)).[3] "If the charge satisfies this standard, and is supported by sufficient evidence, it is not inconsistent for a court to charge a jury on both an actual knowledge theory and a willful blindness theory." *U.S. v. Stewart*, 185 F.3d 112, 126 (3d Cir. 1999); *accord Wert-Ruiz*, 228 F.3d at 252. "This is so because, if the jury does not find the existence of actual knowledge, it might still find that the facts

---

[3] *Brodie* mistakenly quotes *Caminos* as stating that the instruction must make clear that "the defendant himself was ***objectively*** aware of the high probability of the fact in question." 403 F.3d at 148 (emphasis added). Judge Vazquez properly explained that willful blindness is a *subjective* state of mind. A1277–78.

support a finding of willful blindness." *Wert-Ruiz*, 228 F.3d at 252. Both theories may be charged even where "the government proceeded at trial on an actual-knowledge theory." *Stewart*, 185 F.3d at 126; *see Wert-Ruiz*, 228 F.3d at 252 ("reject[ing] [the defendant's] subtle contention that so long as there is sufficient evidence of actual knowledge, a willful blindness charge is at all events inappropriate").

### B. The Evidence Supported A Willful Blindness Instruction.

Testimony from multiple witnesses, including Puccio himself, permitted the jury to conclude that Puccio deliberately closed his eyes to what otherwise would have been obvious to him regarding the submission of fraudulent prescriptions. During its opening statement, the Government argued that Puccio joined the conspiracy knowing that its object was to commit health care fraud by facilitating the prescribing of medically unnecessary medications to enrich himself. A439, 1276–77. Consistent with that theory, Frazzano testified that Puccio participated in filling out the prescriptions before handing envelopes containing them to Dr. Marella, including an envelope containing a $500 cash bribe. A492–94, 497, 511–12, 516. Dr. Marella confirmed that the prescriptions he received from Puccio and Frazzano were pre-filled, A623–28, 639, and that the envelope he received at the first dinner meeting contained $500 cash, A660. On one occasion, Puccio handed Dr. Marella an envelope filled with pre-filled prescriptions, which Dr. Marella signed; Dr. Marella faxed

the prescriptions to the pharmacy that night; and the pharmacy began filling them the very next day. *See supra* pp. 7–9.

Not only did Puccio argue that he could not be guilty of fraud because he lacked the knowledge to form the requisite criminal intent, he also testified to that belief himself. He told the jury that he handed blank prescription forms to Dr. Marella for completion and not forms that he had pre-filled with profit-generating information. A1092–93, 1114. The testimony, along with testimony denying that he gave Dr. Marella envelopes of any kind, became a cornerstone of his defense during summation. A1326, 1337, 1340, 1342.

Had the jury credited Puccio's testimony and found insufficient government evidence of actual knowledge, it could have credited Frazzano, Dr. Marella, and various other government witnesses to "conclude[ ] that willful blindness was afoot." *Wert-Ruiz*, 228 F.3d at 252. Those witnesses included:

- Dr. Agresti, a cooperating witness who received pre-filled prescription forms from the pharmaceutical representatives he worked with and signed prescriptions for several testifying patients, including the Frazzanos (procured by Puccio), without examining them, A544–62, 600–06, 619–21;

- Anthony Lewis-Lahey (A843–55), Raymond Harris (A862–80), Cristina Frazzano (A929–41) and Linda Ruta (A995–1006): "patients" who testified that they didn't complete any aspect of the medical history forms associated with their compound prescriptions; they received medically unnecessary compound medications without being examined by the prescribing doctor; and they received reimbursements for their co-pays from Frazzano;

- Christopher Blackstone, a cooperating witness who owned one of the corrupt pharmacies; knew that the pharmacy prepared prescriptions in consultation with the sales representatives using the highest reimbursing medications and without input from the prescribing physician; and explained why the initials of a sales representative would appear at the bottom of a prescription, A678–731, 751–53;

- Denise Clemons, a bank records custodian who authenticated checking account statements of Puccio documenting various incriminating transactions, like entries for dinner with Dr. Marella and copies of checks to his mother-in-law reimbursing her for co-pays, A830–41; and

- FBI Special Agent Bruce Wayne, a summary witness who testified to incriminating payments from various entities to Puccio and to Frazzano; claims submitted for prescriptions written by Drs. Agresti and Marella; and cell phone records documenting (a) the flurry of incriminating calls and texts on September 21, 2017, when the FBI confronted Frazzano, and (b) the movement of Puccio's cell phone to Frazzano's home soon after that confrontation, A895–926.

The jury also could have credited the aspects of Puccio's testimony corroborated by government witnesses. Puccio admitted that he knew that Frazzano recruited the teachers as patients. A1117. He admitted to attending dinners with Dr. Marella and to knowing that Dr. Marella signed the prescriptions. A1113–14. He also admitted to making money off Dr. Marella's prescriptions. A1113–14, 1117. In fact, he admitted to writing several emails revealing that he closely monitored the electronic portal that recorded when prescriptions were approved so he could know when to

demand commissions for himself and for Frazzano.   A1131–39; *see* A516 (Frazzano's corroborating testimony).

The Government's evidence was sufficient to prove both willful blindness *and* actual knowledge, so it was not inconsistent for the court to give both charges as Puccio contends.   *Compare Wert-Ruiz*, 228 F.3d at 252 ("[A]ssuming there to be sufficient evidence as to both theories, it is not inconsistent for a court to give a charge on both willful blindness and actual knowledge."), *with* DB22 ("[I]t is both logically impossible to manage a conspiracy while purposefully maintaining ignorance of that same conspiracy.").   The evidence also refutes his claim that "the Government's own evidence foreclosed a finding that [he] deliberately avoided learning about the criminal scheme."   DB22.

Puccio seems unwilling to accept the principle that his own testimony subjected him to evidence-based challenges to his defense.   As the District Court explained, he could have exercised his constitutional right not to testify but chose to do so and present evidence in service of a porous theory of defense, which the Government was entitled to attack.   "[T]here is nothing improper about a prosecutor attempt[ing] to focus the jury's attention on holes in the defense's theory," however.   *U.S. v. Lore*, 430 F.3d 190, 213 (3d Cir. 2005) (cleaned up).   The Government may attack "the strength of the defense on the merits," *U.S. v. Ruiz*, 710 F.3d 1077 (9th Cir. 2013) (cleaned up), and the willful blindness instruction in this case enabled it to launch that proper

23

attack, based on rational inferences from the evidence. Correspondingly, the instruction gave the jury the tools to accept or reject the Government's alternative theory of guilt in response to Puccio's defense.

## C. The Willful Blindness Charge Was Legally Sufficient.

When evaluating jury instructions, this Court "consider[s] the totality of the instructions and not a particular sentence or paragraph in isolation." *U.S. v. Jimenez*, 513 F.3d 62, 74–75 (3d Cir. 2008) (cleaned up). Here, the District Court lifted the text of Model Instruction 5.06—itself modeled after the Supreme Court's instructional guidance in *Global-Tech Appliances*, 563 U.S. at 769–70, *see* Model Instruction 5.06 cmt. p. 19—and inserted the entire charge after the instructions on mental states and motive:

> **Willful Blindness**: Even though it has the same word as willfully, which I defined, willful blindness is different. It's a substitute for knowledge, which I already defined. I just want to make sure we keep those distinct.
>
> **To find the defendant guilty of conspiracy to commit health care fraud, you must find that the Government proved beyond a reasonable doubt that the defendant knew** the object of the conspiracy was to commit health care fraud by facilitating the prescribing of medically unnecessary prescriptions in order to generate a profit.
>
> In this case, there's a question whether the defendant knew that any other person committed any element of health care fraud. **When, as in this case, knowledge of a particular fact or circumstance is an essential part of the offense charged, the Government may prove that the defendant knew of that fact or circumstance, if the evidence proves beyond a reasonable doubt**

24

**that the defendant deliberately closed his eyes to what would
otherwise have been obvious to him**.

**No one can avoid responsibility for a crime by deliberately
ignoring what is obvious. Thus, you may find that the defendant
knew** that any other person committed an element of health care
fraud **based on evidence which proves that the defendant himself
subjectively believed that there was a high probability that this
fact existed, and defendant consciously took deliberate actions
to avoid learning about the existence of this fact**.

**You may not find that the defendant knew** that any other
person committed any element of health care fraud **if you find
that the defendant actually believed that this fact did not exist.
Also, you may not find that the defendant knew** that any other
person committed any element of health care fraud **if you find
only that the defendant consciously disregarded a risk that the
fact existed, or that the defendant should have known that the
circumstances existed, or that a reasonable person would have
known of a high probability that the circumstance exists.**

**It is not enough that the defendant may have been reckless
or stupid or foolish, or may have acted out of inadvertence or
accident. You must find that the defendant himself subjectively
believed there was a high probability of the existence that any
other person committed any element of health care fraud,
consciously took deliberate actions to avoid learning about it,
and did not actually believe that it did not exist.**

*Compare* A1276–78, *with* Model Instruction 5.06 (boldface).

Puccio may have forfeited his claim that this instruction "did not

sufficiently convey to the jury that willful blindness could not be considered on

the issue of whether [he] agreed with others to commit the underlying health

care fraud."   DB23–24, 26 ("At no time did the District Court advise the jury

of the distinct issues of entering into an agreement and knowledge that health care fraud was being committed."). Although he objected to giving the instruction entirely—on the ground that it was inconsistent with the mental state for joining the conspiracy—he did not challenge any specific language in the proposed instruction during the charge conference. A1189–92, 1240–47. Nor did he object after the District Court read the instruction to the jury. A1360.[4] If Puccio forfeited his claim, this Court may review it only for plain error.[5] But no error occurred, so even if this Court reviews his claim under a different standard, it should reject the challenge.

The District Court explained with laser precision that willful blindness is a "substitute for knowledge" without reference to any other mental state, like

---

[4] Rule 30(d) of the Federal Rules of Criminal Procedure provides in relevant part:

> A party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate. . . . Failure to object in accordance with this rule precludes appellate review, except as permitted under Rule 52(b).

[5] Under the plain error standard, Puccio "must prove that: (1) the Court erred; (2) the error was obvious under the law at the time of review; and (3) the error affected substantial rights, that is, the error affected the outcome of the proceedings." *Savage*, 85 F.4th at 137 (citing *Johnson v. U.S.*, 520 U.S. 461, 467 (1997)); *accord Greer v. U.S.*, 593 U.S. 503, 507–08 (2021). If the defendant satisfies those three prongs, "an appellate court may grant relief if it concludes that the error had a serious effect on the fairness, integrity or public reputation of judicial proceedings." *Greer*, 593 U.S. at 507–08 (cleaned up); *accord Savage*, 85 F.4th at 137. "The standard imposes a difficult burden." *U.S. v. Nucera*, 67 F.4th 146, 170 (3d Cir. 2023).

intent.   A1276.   Thus, like the willful blindness instruction upheld in *Stadtmauer*, the instruction here "made clear that willful blindness applied only to the element of knowledge."   620 F.3d at 258.   Not only that, but the District Court specified what, precisely, Puccio had to know to find him guilty: "that the object of the conspiracy was to commit health care fraud by facilitating the prescribing of medically unnecessary prescriptions in order to generate a profit."   A1276–77.

    That instruction amplified the District Court's previous instruction about knowledge, where the court explained that the mental state applied only to certain elements of the charged health care fraud conspiracy, A1274, and foreshadowed a narrow aspect of the very next charge: the elements of the conspiracy, A1278–83.   Of the three elements, phrasing only in the second and third elements drew a connection between knowledge and the conspiracy's objective.   The District Court repeatedly explained that the Government had to prove that Puccio "joined the agreement or conspiracy *knowing of its objective* to commit health care fraud."   A1279 (emphasis added); *accord* A1281–82.   When an element required proof of intent without knowledge, the District Court said so.   A1278–83 (applying intent to aspects of the conspiracy's second and third elements).[6]

---

[6] The District Court understood the difference well.   The court warned the Government that it would immediately give a curative instruction if the Government used willful blindness as a substitute for intent.   A1246–47.

In short, when read with the surrounding instructions, the District Court's willful blindness charge did not give the misimpression that willful blindness could be used to prove that Puccio intentionally joined the conspiracy (second element). *But see* DB24, 26–27. The instruction was plain and to-the-point, tracking substantially verbatim the model instruction, not "prolix and convoluted" as Puccio claims. *Compare* DB19, *with U.S. v. Tai*, 750 F.3d 309, 314–15 (3d Cir. 2014) (rejecting constitutional challenge to a willful blindness charge that tracked the model instruction).

In any event, even if the District Court should not have instructed the jury on willful blindness, any error was harmless and didn't affect the outcome of the trial. The court properly instructed the jury on actual knowledge, which Puccio does not contest. The jury could have concluded that, rather than being willfully blind, the evidence showed that Puccio knew that the object of the conspiracy was to defraud New Jersey health care plans out of money for medically unnecessary medications. A497, 511–12, 516, 623–28, 639, 660; *see supra* pp. 7–9, 21–22 (summarizing testimony circumstantially proving Puccio's actual knowledge). Given the evidence of Puccio's actual knowledge, any error did not prejudice him. *See Stadtmauer*, 620 F.3d at 260 n.26 (any error was harmless as willful blindness charge contained the correct legal standard and there was ample evidence of defendant's actual knowledge); *U.S. v. Leahy*, 445 F.3d 634, 654 n.15 (3d Cir. 2006) (citing cases); *U.S. v. Adeniji*, 31 F.3d 58, 63–64 (2d Cir. 1994) (error in giving willful

blindness charge was harmless, as jury was capable of deciding, as it was instructed, that it could not convict using that theory unless there was evidence to support it).   This Court should therefore reject Puccio's challenge to the willful blindness instruction.

## II.   THE DISTRICT COURT DID NOT CLEARLY ERR BY IMPOSING AN AGGRAVATING ROLE ENHANCEMENT FOR BEING A MANAGER OR SUPERVISOR IN THE HEALTH CARE FRAUD CONSPIRACY.

**Standard of Review**:   Clear error. *U.S. v. Adair*, 38 F.4th 341, 347 (3d Cir. 2022).   Clear error does not exist unless the district court's ruling was "completely devoid of a credible evidentiary basis or bears no rational relationship to the supporting data." *U.S. v. Vitillo*, 490 F.3d 314, 330 (3d Cir. 2007).

The evidence at trial showed that Puccio deserved a *three*-level enhancement under U.S.S.G. § 3B1.1(b) because he managed and supervised criminal activity that involved at least five participants or that was otherwise extensive.   That same evidence supports the District Court's cautious ruling to apply the lesser enhancement under subsection (c).

### A.   Legal Standard

Sentencing proceeds in three steps.   *U.S. v. Flores-Mejia*, 759 F.3d 253, 255–56 (3d Cir. 2014) (en banc).   At steps one and two, a sentencing court calculates a defendant's advisory Guidelines range and rules on any motions for departure.   *Id.* at 256.   At the third step, the court must exercise its discretion by considering the relevant 18 U.S.C. § 3553(a) factors in deciding on a sentence.   *Id.*

Appellate review of a sentence proceeds in two stages.   First, this Court must "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range" or failing to consider the 18 U.S.C. § 3553(a) factors.   *Gall v. U.S.*, 552 U.S. 38, 51 (2007); *U.S. v. Tomko*, 562 F.3d 558, 567 (3d Cir. 2009) (en banc).   Second, if no reversible procedural error occurred, this Court must ensure that the sentencing judge reasonably applied the factors enumerated in § 3553(a) to the circumstances of the case.   *Tomko*, 562 F.3d at 567.

Puccio raises only a procedural objection to his sentence.   It is reviewable only for clear error.

## B.   The Record Supports The Finding That Puccio Was A Manager Or Supervisor Of The Scheme.

Guideline 3B1.1(c) instructs a sentencing judge to increase a defendant's offense level by two "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b)" of the guideline.[7]   "For the aggravating role enhancement to apply, evidence must show [by a preponderance of the evidence] that the defendant exercised some degree of control over at least one other person involved in the offense."   *U.S. v. Raia*, 993 F.3d 185, 192 (3d Cir. 2021) (cleaned up) (citing cases).

---

[7] Subsection (a) requires a *four*-level enhancement where "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."   Subsection (b) requires a *three*-level enhancement where "the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive."

Like "organizer" and "leader," "manager" and "supervisor" "are not terms of art, [so] they take on their 'ordinary, contemporary, common meaning.'" *Adair*, 38 F.4th at 350 (quoting *Perrin v. U.S.*, 444 U.S. 37, 42 (1979)).[8] As this Court has explained, they are "related terms." *Id.* at 352–53. Both "refer[ ] to a person with oversight over operations or *other persons*." *Id.* at 352 nn.16 & 17 (citing dictionaries) (emphasis added). Because "[t]he Guideline precedes those terms with the indefinite article, 'an,'" like subsection (a), subsection (c) "is not seeking to identify a single person as" manager or supervisor. *Id.* at 351. "Instead, through the indefinite article," subsection (c) "allows the possibility that multiple persons engaged in the same criminal activity could qualify as" managers or supervisors—just like through its use of "an," subsection (a) "allows the possibility that multiple persons engaged in the same criminal activity could qualify as organizers or leaders." *Id.*

The record amply supports the District Court's determination that the "oversight" Puccio exercised over Frazzano satisfied subsection (c). *See id.* at 352 nn.16 & 17. Puccio recruited and trained Frazzano on the methods of the fraud. As Frazzano testified, he was in Puccio's "downline," meaning Puccio was above him at Rep Network, and earned a portion of every prescription

---

[8] In *Adair*, this Court applied *U.S. v. Nasir*, 17 F.4th 459 (3d Cir. 2021) (en banc), to hold that "[t]he text, structure, purpose, and history of Guideline § 3B1.1 compel the conclusion that the terms 'organizer' and 'leader' are not genuinely ambiguous" and that "the multi-factor test in the commentary, *see* U.S.S.G. § 3B1.1, cmt. 4, is not controlling" as a result. *Adair*, 38 F.4th at 354. The Court defined "manager" and supervisor" as part of its reasoning. *Id.* at 352 nn.16 & 17.

Frazzano caused to be billed.[9]   A510.   Puccio was the one to direct Frazzano

to find doctors and patients.   A488–97, 544–47, 623–28, 760–61.   And it was

Puccio who directed Frazzano to cover their tracks when the FBI came

knocking on Frazzano's door.   A520–22, 939.

Puccio's influence over Frazzano was so obvious that Dr. Marella and

two patients, including Frazzano's wife, had no trouble recognizing it.   A626

(Dr. Marella explaining that he addressed Puccio with questions about the

medications because Puccio "seemed more knowledgeable" than Frazzano);

---

[9] Without citing to the record, Puccio claims that he and Frazzano were
"both sales reps doing the same thing and *collecting commissions from each other's
business and splitting them in equal increments*."   DB31.   The claim blurs what
actually happened, however.   There was a time that Rep Network's
hierarchical recruitment and income structure enabled Frazzano to make
money off his own prescriptions, which Puccio had procured through Dr.
Agresti, but Rep Network put an end to that practice.   A464–65, 476.   The
record also establishes that Puccio personally paid Frazzano a commission for
Frazzano's prescriptions after that structural change.   A476.

But the record doesn't show that Frazzano made money off any
prescriptions from Dr. Agresti after the protocol changed.   Nor does the
record show that Frazzano made money off other prescriptions Dr. Agresti
signed—like those he signed for Frazzano's wife, A557–60, 565–66, *see supra* p.
6, and for Puccio's mother-in-law, A601–05.

By contrast, Frazzano's testimony establishes that, consistent with Rep
Network's pay structure and as the person who recruited Frazzano into the
business, Frazzano (and Puccio) made money off prescriptions Frazzano
procured—i.e., those he procured through *Dr. Marella*.   A510; *see, e.g.,* A908–
11, 1133–34 (Puccio and Frazzano received commission for an October 23,
2015 compound prescription *Dr. Marella* signed for Puccio's mother-in-law);
*compare, e.g.,* A504–06 (Frazzano recruited patient Harris), *and* A629–31 (Dr.
Marella signed prescriptions for patient Harris), *with* A1138–39 (on November
27, 2015, Puccio inquired about getting credit for prescriptions for patients
Harris and Lahey).

32

865 (patient Harris, whom Puccio and Frazzano attempted to recruit as a sales representative, describing Puccio as "the head" of the business); A938 (Frazzano's wife describing Puccio as being "in charge").   It's the reason Frazzano's wife called Puccio when the FBI confronted them.   A938.

On top of all that, Puccio asserted himself as Frazzano's superior when he told other co-conspirators that "Pete [Frazzano] works directly under me":



A1131–32.   Puccio was thus not a mere participant in the scheme as it related to the teachers.   He supervised and managed it consistent with this Court's interpretation of § 3B1.1.   *See Adair*, 38 F.4th at 351–52 & nn.16, 17.

This Court may not disturb that ruling simply because Puccio interprets other evidence as minimizing his role in the conspiracy. Even if, as he argued below and as he argues on appeal, certain evidence indicated that he was not the "architect" of the scheme, he was responsible for a loss amount less than other co-defendants, and he participated in the conspiracy for a shorter amount of time compared to other co-conspirators, DB29–32, the evidence doesn't invalidate the more abundant evidence establishing his managerial role. That's because the clear error standard erects a barrier to the sentence vacatur he seeks. This Court may not disrupt the District Court's findings unless they are "completely devoid of minimum evidentiary support displaying some hue of credibility" or lack any "rational relationship to the supportive evidentiary data." *DiFederico v. Rolm Co.*, 201 F.3d 200, 208 (3d Cir. 2000). The record is chock full of evidence supporting the enhancement, so the District Court's ruling must carry the day.

A remark counsel made at sentencing underscores the impediment Puccio faces.[10] There, counsel acknowledged Puccio's testimony that "he brought Frazzano in and he was talking to him and so on." A1408. Counsel also acknowledged the emails Puccio sent asserting that Frazzano was his downline. A1409. To justify not enhancing Puccio's sentencing range, counsel implored the District Court to disregard that evidence:

"*[N]otwithstanding the testimony at trial*, from a high level if you look at this

---

[10] Sentencing counsel represents Puccio on appeal.

conspiracy and if you look at the individuals involved, Mr. Puccio . . . should not receive a certainly a three-level enhancement for his role." A1407 (emphasis added). That plea reinforces why Puccio cannot meet the clear error standard.

In any event, Puccio's conduct didn't "mirror[ ] those of the other low-level participants" to whom he compares himself. DB32 (quoting *U.S. v. DeGovanni*, 104 F.3d 43, 44–46 (3d Cir. 1997)). First, while he may not have "devised, orchestrated and facilitated" the scheme as its "architect," DB29— conduct consistent with that of a leader or organizer, *see Adair*, 38 F.4th at 351 & n.9—he was the brainchild of at least the portion of the fraud proven at trial: the portion relating to the prescriptions for teachers at Frazzano's school and Puccio's family members. Puccio specifically directed Frazzano to recruit the teachers for their robust insurance. He taught Frazzano how to entice them by offering to pay their co-pays. And he taught Frazzano how to maximize profits by pushing high-reimbursing medications and maximizing refills.

Second, although the loss amount attributable to Puccio ($2,650,000) was less than the losses individually attributable to Frazzano ($2,727,292), Rep Network's president ($2,873,855), and Dr. Agresti ($8,914,000), that comparison doesn't measure the oversight Puccio exercised over Frazzano in the scheme charged in the indictment. The commissions he and Frazzano were positioned to make do. The scheme involved Rep Network's pyramid pay structure designed to enable Puccio to make money off the reimbursements he caused by himself *and* off the reimbursements caused by

35

Frazzano or any other representative Puccio recruited.   A510, 1094–96, 1101, 1137–38.   It was also designed to enable Frazzano to make money off the reimbursements he caused—i.e., the reimbursements he caused through Dr. Marella—*but not* off the reimbursements Puccio caused himself or those caused by other representatives Puccio recruited.   *See supra* p. 32 n.9.

Third, the duration of Puccio's participation in the conspiracy (November 2014 through March 2016) compared to Rep Network's President and Dr. Agresti (November 2014 through September 2017) matters little when, as Puccio's protégé, Frazzano participated in the conspiracy for the same span of time Puccio did (November 2014 through March 2016) and made less money than Puccio made.   PSR ¶¶ 1, 4, 7, 9, 47.   That's the comparison that matters because it measures the fruits of their criminal activity at the time Puccio exercised oversight over Frazzano.

Puccio lobs one final argument that the enhancement was improper because the plea agreements of Puccio's co-conspirators include no aggravating role adjustments, DB33, but the claim is frivolous.   Before the District Court Puccio acknowledged that the sentencing judge could assign those adjustments at the sentencing hearings of those defendants based on that judge's assessment of the evidence.   A1410.   He is correct, even though he shies away from acknowledging that court's duty on appeal.   In any event, this Court should reject the invitation to use the plea agreements as a yardstick for measuring Puccio's conduct.   Accepting such an invitation could "seriously interfere with the Government's interest in securing [those] guilty pleas" and prevent

36

those defendants from receiving the benefit of their bargain. *U.S. v. Ruiz*, 536 U.S. 622, 631 (2002).

## CONCLUSION

This Court should affirm Puccio's conviction and sentence.

Respectfully submitted,

**PHILIP R. SELLINGER**
UNITED STATES ATTORNEY

By:   s/ Richard J. Ramsay
Assistant United States Attorney
970 Broad Street, Suite 700
Newark, NJ 07102-2535
(973) 645-2700

Date:   January 24, 2024

# CERTIFICATE OF COMPLIANCE

I hereby certify that I am an Assistant United States Attorney for the District of New Jersey, that I am filing the attached Brief and Supplemental Appendix for Appellee, and:

(1) the Brief complies with the length limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 8,464 words;

(2) the Brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) by using Microsoft WORD 2016's 14-point proportionally spaced Calisto MT;

(3) the text of the PDF and paper copies of the Brief are identical; and

(4) the PDF copies of the Brief and Supplemental Appendix were prepared on a computer that is automatically protected by a virus detection program, namely a continuously updated version of Trellix Endpoint Security, and no virus was detected.

By: s/ Richard J. Ramsay
Assistant U.S. Attorney

Dated:   January 24, 2024

## CERTIFICATION OF FILING AND SERVICE

(a) I hereby certify that on January 24, 2024, I caused the Brief and Supplemental Appendix for Appellee to be filed with the Clerk of this Court by electronic filing in the PDF form using the Circuit's electronic filing system, and (b) within one week of this date, I will cause filing of an original and six paper copies of the Brief and four paper copies of the Supplemental Appendix using postage-prepaid first-class mail.

I also certify that on January 24, 2024, I caused the Brief and Supplemental Appendix for Appellee to be served:

[X] by the Notice of Docketing Activity generated by the Third Circuit's electronic filing system, on the following Filing User:

James Kousouros, Esq.

james@kousouroslaw.com

s/ Richard J. Ramsay
Assistant United States Attorney

Dated: January 24, 2024